No. 61,771

MARK A. BRIDGES, *Appellee/Cross-Appellant*, v. GEORGE W. BENT-LEY, deceased, by ICY BENTLEY, Special Administrator, *Appellant/Cross-Appellee*.

(769 P.2d 635)

Opinion filed March 3, 1989.

*John D. Osborn*, of Calihan, Brown, Osborn, Burgardt & Wurst, of Garden City, argued the cause and was on the briefs for appellant/cross-appellee.

*Dan L. Wulz*, of Bryan, Lykins, Hejtmanek & Wulz, P.A., of Topeka, argued the cause, and *Dan Lykins*, of the same firm, was with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

McFARLAND, J.: Plaintiff, Mark A. Bridges, suffered personal injuries when he was struck by a truck while he was giving assistance to victims of another vehicular accident. The jury found plaintiff's damages to be $1,018,635.00 and assessed 72% of the fault to Icy Bentley as Special Administrator for George W. Bentley, deceased. The Special Administrator appeals from the judgment, and plaintiff cross-appeals therefrom.

During the evening of June 8, 1984, on Highway 50 east of Garden City, plaintiff was driving a liquid fertilizer truck in a westerly direction. George W. Bentley was driving a pickup truck which was towing an automobile. Bentley attempted to pass plaintiff, was unable to do so, and struck an eastbound station wagon head-on which was being driven by Terry Sawyers.

Plaintiff stopped on the shoulder of the road to give assistance. He advised another giver of assistance to stop oncoming traffic and went to the station wagon which was partially in the roadway. The vehicle contained the driver and his four-year-old nephew, Michael Burgess. Almost immediately a Great Plains Chemical Company pickup truck, driven by Randy McElreath, collided with some of the vehicles at the scene of the first accident and struck plaintiff. Plaintiff suffered a fractured arm, severe head injuries, and other less severe injuries.

The jury assessed fault as follows:

| | |
|---|---|
| Great Plains Chemical Company | 17% |
| Terry G. Sawyers | 9% |
| George W. Bentley | 72% |
| Plaintiff Mark A. Bridges | 2% |

Other facts will be stated as necessary to the discussion of particular issues on appeal.

We shall first consider the issues raised in the Bentley appeal.

### RESCUE DOCTRINE

For his first issue, Bentley contends the trial court erred in instructing the jury on the "rescue doctrine."

The final paragraph of Instruction No. 3 states:

"Plaintiff denies that he acted in a rash or wanton manner as a pedestrian in attempting to rescue Michael Burgess and contends he is free from fault under the 'rescue doctrine' as recognized under Kansas law."

## Instruction No. 23 states:

"A person who is injured while attempting to rescue another from peril in an emergency situation is not negligent merely on the ground that the rescue entails danger to himself. The law has a high regard for human life and efforts to save it. Danger invites rescue. The impulse to respond to an urgent call for aid, without complete regard for one's own safety, is recognized as normal. The law will not impute negligence to an effort to preserve life unless made under such circumstances as to be rash or wanton. Conduct is rash or wanton when it is undertaken in utter disregard of the consequences.

"If you find the plaintiff, Mark Bridges, acted in an emergency situation to rescue Michael Burgess from peril and that plaintiff's conduct was not rash or wanton, your finding will be that plaintiff was not negligent. If you find that there was no peril to Michael Burgess or that even though there was such peril plaintiff's conduct was rash or wanton, your finding will be that plaintiff was negligent."

Bentley concedes that the instructions quoted adequately state the "rescue doctrine" recognized in Kansas in such cases as *Brock, Administrator v. Peabody Cooperative Equity Exchange*, 186 Kan. 657, Syl. ¶ 1, 352 P.2d 37 (1960), where we held:

"It is not contributory negligence for a person to risk his life or place himself in a position of great danger in an effort to save the life of another or to rescue another from a sudden peril or great bodily harm; the law has so high a regard for human life that it will not impute negligence to an effort to preserve it unless made under such circumstances as to constitute rashness in the judgment of prudent persons."

He argues, however, that the enactment of the comparative negligence statute, K.S.A. 60-258a, eliminated the rescue doctrine from Kansas law. Bentley contends the rescue doctrine was a public policy exception to the harsh effects of the law of contributory negligence for the benefit of those who were injured while attempting the rescue of others. In support of his position, Bentley cites *Ryder Truck Rental, Inc. v. Korte*, 357 So.2d 228, 230 (Fla. Dist. App. 1978), which states:

"Now that Florida has abolished contributory negligence, the rescue doctrine is no longer needed to allow a rescuer to recover in spite of his contributory negligence, but there is no logical reason why the principles of comparative negligence should not apply in a rescue case. We therefore hold that when the plaintiff in performing a rescue is himself negligent, he should recover only that

portion of the entire damages sustained by him as the defendant's negligence bears to the combined negligence of both the plaintiff and the defendant."

Plaintiff concedes that this is a question of first impression in Kansas, but contends that the advent of comparative negligence in Kansas did not alter or affect the rescue doctrine. Such a result, he argues, would be consistent with other decisions we have reached on analogous issues.

In *Britt v. Allen County Community Jr. College*, 230 Kan. 502, 638 P.2d 914 (1982), we held the enactment of K.S.A. 60-258a did not change the basic duty of a landowner or possessor of premises owed to those persons entering the premises. In *Britt*, a person was asked to help move a piano at a lecture hall. During moving it, the piano overturned and plaintiff was injured. After a summary judgment ruling favoring defendants, plaintiff appealed, contending K.S.A. 60-258a had modified the traditional rules on the duties of landowners to entrants on land. 230 Kan. at 503. We disagreed, stating:

"This [comparative negligence] statute treats and is limited to the extent of liability for damages arising from an occurrence. Its purpose is to distribute liability on the basis of causal fault. *It does not concern the nature and extent of the duty owed.* It concerns itself with the 'all or nothing' philosophy which previously attended tort negligence actions when the contributory negligence of the plaintiff, however slight, foreclosed all defendant's responsibility for plaintiff's injuries. The enactment of the comparative negligence statute, K.S.A. 60-258a, did not affect or change the basic duty of a landowner or possessor of premises owed to those persons entering the premises." 230 Kan. at 505. (Emphasis supplied.)

In *Akins v. Hamblin*, 237 Kan. 742, 703 P.2d 771 (1985), plaintiff contended enactment of the comparative negligence law meant the negligence of passengers must be compared in an automobile negligence lawsuit. We rejected this challenge, stating:

"This court has never recognized that a passenger owes a duty to other passengers or third parties. It has been held in several cases that the legislature's enactment of the comparative negligence law did not create any new duties." 237 Kan. at 749.

In other contexts this court has unequivocally stated "no change" in common-law duties occurred as a result of the enactment of our comparative negligence statute. See *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 675 P.2d 864

(1984) (bailor-bailee duties); *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982) (duty of city to keep streets safe); *Taplin v. Clark*, 6 Kan. App. 2d 66, 626 P.2d 1198 (1981) (duties of drivers and passengers).

Plaintiff cites cases from other jurisdictions in support of his position. In *Allison v. Sverdrup & Parcel & Assoc.*, 738 S.W.2d 440 (Mo. App. 1987), the Missouri Court of Appeals held it was reversible error to refuse to instruct on the rescue doctrine even though Missouri had adopted comparative negligence. After reviewing numerous cases on the issue, including those holding that adoption of comparative negligence had abrogated the rash or reckless standard, the court said:

> "We are persuaded by the forceful reasoning in the foregoing cases. Under the rule of comparative fault in Missouri, a person who sees another in imminent peril created by the negligence of defendant will not be charged with negligence in risking his or her own life or serious injury in an attempt to rescue, provided he or she does not act recklessly or rashly. In other words, it is not negligence for a plaintiff to expose himself to danger in an attempt to save a third person from harm created by another, unless the effort to save is a rash or reckless one, or the plaintiff acts rashly or recklessly in the course of it. If the defendant establishes that the rescuer's actions were reckless or rash, the rescuer is negligent.
>
> "If it is found that the rescuer was negligent, the trier of fact should compare his or her negligence with that of the one whose negligence created the situation to which the rescue was a response. In awarding damages, the rescuer is only entitled to recover the portion of the entire amount of damages sustained that are attributable to the defendant's negligence in creating the perilous situation." 738 S.W.2d at 454.

Plaintiff also refers us to *Furka v. Great Lakes Dredge & Dock Co., Inc.*, 755 F.2d 1085 (4th Cir. 1985), *cert. denied* 474 U.S. 846 (1985), *appeal after remand* 824 F.2d 330 (4th Cir. 1987), *cert. denied* 108 S.Ct. 775 (1988). *Furka* was a Jones Act case in which principles of comparative negligence applied. Defendant contended that comparative negligence abrogated the rescue doctrine. The trial court adopted defendant's position and refused to instruct on the rescue doctrine. The Court of Appeals found the refusal to instruct on the rescue doctrine was reversible error and held the rescuer's conduct must be wanton or reckless:

> "The submission to the jury of a question of Furka's contributory negligence without reference to the special context of rescue ignored the very premise upon which appellant's case was based. . . .
>
> . . . .
>
> ". . . If the jury finds plaintiff engaged in a rescue, there must be evidence of wanton or reckless behavior on plaintiff's part before any fault may be assigned. . . .

"We reject appellee's contention that these policies lose their force under the Jones Act, where the doctrine of comparative negligence applies damages proportionately. It is true that the 'wanton and reckless' standard developed under the common law, where contributory negligence was a complete bar to recovery. In some comparative negligence jurisdictions, not in admiralty, the wanton and reckless standard has thus been diluted. . . . *The wanton and reckless standard reflects the value society places upon rescue as much as any desire to avoid a total defeat of recovery under the common law. Law must encourage an environment where human instinct is not insular but responds to the plight of another in peril.*" 755 F.2d at 1088-89. (Emphasis supplied.)

We have no reason to believe the legislature intended to abrogate the rescue doctrine in enacting the comparative negligence statute. Indeed, the legislature has continued to recognize the gross negligence standard in K.S.A. 1988 Supp. 65-2891, the "Good Samaritan Statute," covering emergency health care provided at the scene of the emergency by health care providers. This statute has been amended many times since the introduction of comparative negligence and so does not continue its existence only through oversight.

We conclude the advent of comparative negligence has not abrogated the rescue doctrine in Kansas. It remains sound policy to encourage rescue efforts. An individual who is injured running into a busy street to say hello to his girl friend should not be under the same standard of care as one who is injured attempting to assist a toddler who has been struck by a car. An abrogation of the rescue doctrine would tend to operate as a deterrent to potential rescuers and penalize acts which would constitute ordinary negligence, but would not rise to the level of rash conduct. Such a holding would be one more weapon in the arsenal of the "don't-get-involved" creed of citizenship which is already too prevalent. The trial court did not err in instructing the jury on the rescue doctrine.

## BLOOD ALCOHOL INSTRUCTION

For his second issue, Bentley contends the trial court erred in giving the following instruction:

### Instruction No. 14 states:

"The laws of Kansas provide that it is unlawful for any person to operate or attempt to operate any vehicle while the alcohol concentration in that person's blood, at the time or within two hours after the person has operated or attempted to operate the vehicle, is .10 or more.

"The laws of Kansas provide that it is unlawful for any person who is under the

influence of alcohol to operate or attempt to operate any vehicle within this state. A person is under the influence of intoxicating liquor when the control of his mental or physical function is impaired.

"A driver who is voluntarily under an influence of alcohol must exercise the same degree of care under circumstances then existing as a person who is not under the influence of alcohol."

This is PIK Civ. 2d 8.84.

Defendant contends this instruction was erroneous as the blood alcohol content of George W. Bentley was reported to be .17% from blood samples taken more than two hours after the accident. The pretrial order, in pertinent part, stated:

"As to foundation for Bentley's blood alcohol level taken on the date of the collision, Mr. Osborn [attorney for defendant Bentley] indicates a showing of foundation by affidavit would be acceptable, being an affidavit concerning the circumstances as to how the blood was drawn, when, by whom, when it was transported, and an affidavit describing the analyzation of the blood sample."

The referred-to affidavits were provided and the blood alcohol report was admitted without objection. In overruling defendant's objection to the instruction, the trial court noted George Bentley died at the accident scene, was dead when the samples were drawn, and that metabolism ceases upon death.

Bentley also complains that there was no evidence establishing a causal connection between the ingestion of alcohol and the cause of the accident. There was evidence Bentley pulled his pickup truck and towed automobile into a passing position under circumstances in which successful completion was highly unlikely. The jury could have concluded Bentley's mental function was impaired by his alcohol consumption.

We conclude there was no error or abuse of discretion in the giving of Instruction No. 14.

## CONCURRENT CAUSES

For his third issue, Bentley contends the trial court erred in giving Instruction No. 21.

### Instruction No. 21 states:

"There may be more than one cause of an injury; that is, there may be concurrent causes, occurring independently or together, which combine to produce the injury. A cause is concurrent if it was operative at the moment of the injury and acted with another cause to produce the injury.

"Concurrent causes do not always occur simultaneously. One cause may be continuous in operation and join with another cause occurring at a later time. When the concurring negligence of two or more persons causes an injury, each person is liable. If the negligence of only one person is the cause of the injury, then he alone is liable."

This instruction was PIK Civ. 2d 5.02 verbatim. The trial court also instructed on intervening cause, PIK Civ. 2d 5.03.

The first collision occurred some two minutes before the second which injured the plaintiff.

In *Rowell v. City of Wichita*, 162 Kan. 294, 301-02, 176 P.2d 590 (1947), we said the proximate cause of any injury is:

"[T]hat cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the injury would not have occurred."

We find no error in the giving of Instruction No. 21.

## DIMINISHED EARNING CAPACITY

For his fourth issue, Bentley contends the trial court erred in submitting diminished earning capacity as an element of damage. The jury awarded $180,000 on this element of damage.

In *Morris v. Francisco*, 238 Kan. 71, Syl. ¶¶ 2-3, 708 P.2d 498 (1985), we held as follows:

"In an action for personal injuries, the trial court should instruct the jury only on those items of damage upon which there is some evidence to base an award. It is not proper to give a general instruction on damages for 'any of the following shown by the evidence' when there is no evidence to support an award for a particular item."

"In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the complained-of negligence. Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages, therefore, there must be some reasonable basis for computation which will enable the trier of fact to arrive at an approximate estimate of the amount of loss."

Within this issue are several points. Bentley contends certain testimony of Douglas C. Windholz, a vocational rehabilitation supervisor for the Department of Social and Rehabilitation Services of the State of Kansas, was improper. We agree. Mr. Windholz prepared a chart, Exhibit No. 38, which was introduced as evidence and testified to by the witness. The chart showed seven types of jobs and the hourly wage for each in Garden City, Kansas, and the United States, and multiplied the hourly wages times 2080 (for one year's wages) times a work expectancy of 39 years. The first entry on the chart is illustrative of the format:

Carpenter

|  | Wage/Hr. | | Total Work Hrs/Year | | | Work Life from Current Age (26) to Age 65 (39 work yrs.) |
|---|---|---|---|---|---|---|
| Garden City | 7.31/hr. | X | 2080 | X | 39 | = | $592,987.20 |
| Kansas | 8.05/hr. | X | 2080 | X | 39 | = | 653,016.00 |
| U.S. | 8.12/hr. | X | 2080 | X | 39 | = | 658,694.40 |

The witness obtained the hourly rates from the Kansas Department of Revenue, Division of Employment and Training, and the U.S. Department of Labor. The witness testified he believed plaintiff could have done any of the seven types of work prior to the accident and could not now perform them. The plaintiff had no training or experience in any of the job categories except diesel mechanics. In 1981, plaintiff had been enrolled in a vocational training program in that area, but had been expelled for alcohol related problems. In making the chart and in testifying, the witness assumed plaintiff was experienced and qualified in each area although he knew such was not the case. The exhibit and the line of testimony relative thereto were improper and should not have been admitted.

There was testimony plaintiff performed adequately as a farm laborer prior to the accident and had he continued that employment, unimpaired, he would be earning $1,500 to $1,600 dollars per month plus fringe benefits of $130 per month. At the time of trial, plaintiff was earning $1,200 per month as a farm laborer. As a result of the head injuries plaintiff was substantially impaired in his ability to perform this type of work. Before the accident he was able to follow instructions, work unsupervised, and get along with fellow employees. Now and in the future, he will require close supervision. He tends to forget even simple instructions. He can run a tractor spraying a field, but he might forget to refill the sprayer when it becomes empty or take appropriate action when the tractor needs oil or other maintenance. Plaintiff will need a structured existence the rest of his life for even minimal functions. His situation will not improve and may deteriorate further. There was substantial evidence plaintiff will continue to be a difficult person for which to find and maintain employment. There was evidence the accident had aggravated his problems with alcohol and created serious emotional problems. Any activity involving logic, judgment, and planning will be ongoing problems as a result of his head injuries.

Assuming a working life to age 65 (39 years), the jury's award of $180,000 represents an average monthly diminished earning capacity of $384.67. With plaintiff's accident related handicaps, it is unlikely he would be continuously employed. We conclude that there was substantial evidence upon which to submit the damage element of diminished earning capacity to the jury and that the award is supported by the evidence, excluding the improperly admitted testimony and exhibit. We are further satisfied that the trial court's abuse of discretion admitting such evidence is not reversible error as it did not affect the verdict herein. The cross-examination of the witness Windholz clearly pointed out to the jury the fallacy of such figures being appropriate to any determination of diminished earning capacity, and the award entered also shows the jury's disregard of the improperly admitted evidence.

## FUTURE MEDICAL EXPENSE

For his fifth issue, Bentley contends the trial court erred in submitting future medical expense as an element of damage. The jury awarded $250,000 for this element of damage.

It would appear from Bentley's brief that most of the evidence relative to future medical expense was in the form of the videotaped deposition of Dr. Gregg M. Snyder, the treating neurosurgeon. There is indicated in the briefs that this was "separately transcribed." Neither the videotaped deposition nor the separate transcription thereof is a part of the record before us on appeal.

As we said in *Farmers State Bank v. Production Cred. Ass'n of St. Cloud*, 243 Kan. 87, Syl. ¶ 1, 755 P.2d 518 (1988):

"The appellant carries the burden of designating a record sufficient to present its points to this court."

We, therefore, conclude there is not sufficient record before this court from which we can determine this issue, and, accordingly, we can find no error in the submission of, and award for, future medical expense.

## MOTIONS FOR MISTRIAL

For his sixth issue, Bentley contends the trial court abused its discretion in overruling his two motions for mistrial.

In his first motion for mistrial, Bentley argued that plaintiff's counsel engaged in improper voir dire by asking the prospective jurors if any of them had been employed as insurance adjustors

and telling the jurors "not to worry about how any verdict might be collected." Bentley contends that this was an improper interjection of insurance into the proceedings.

Unfortunately, the voir dire was not transcribed and all that is before us is Bentley's paraphrased statement of what was said. We do not know the actual statements nor the context in which the statements were made. As we said in the preceding issue, the appellant has the burden of bringing a sufficient record before us from which we can determine his or her claims of error. There being no such record before us, we can find no error.

We turn to the second motion for mistrial.

During plaintiff's examination of Daniel Etzel, a witness to the accident, the following transpired:

"Q: [By attorney for plaintiff.] Mr. Etzel, do you recall someone representing Mr. Bentley called you and—about July?

"A: Pardon me? I can't—I didn't hear.

"Q: I'm sorry. Mr. Etzel, do you recall someone representing Mr. Bentley called you in about July, 1984, and you gave him a—you gave a statement to him?

"A: I gave a statement to a claims adjustor. I have no idea—."

While there was no contemporaneous objection immediately following Etzel's testimony, defendant's counsel told the court, out of the jury's presence, he would be making a motion for mistrial for "plaintiff's counsel eliciting from Mr. Etzel that he had his statement taken by a claims adjustor." Plaintiff's counsel asserted Etzel was not his witness and he had told all of his witnesses never to mention insurance. Defendant subsequently moved for a mistrial. The trial court overruled the motion, terming it an inadvertent reference. We find no abuse of discretion in this determination.

## MOTION FOR A NEW TRIAL

For his seventh issue, Bentley contends the trial court abused its discretion in denying his motion for a new trial.

From among the grounds for a new trial set forth in K.S.A. 60-259, Bentley argues the following are applicable:

"*First.* Because of abuse of discretion of the court, misconduct of the jury or party, or accident or surprise which ordinary prudence could not have guarded against, or for any other cause whereby the party was not afforded a reasonable opportunity to present his evidence and be heard on the merits of the case.

"*Second.* Erroneous rulings or instructions of the court.

"*Third.* That the verdict, report or decision was given under the influence of passion or prejudice."

The statutory grounds for a new trial were discussed in *Sulkis v. Zane*, 208 Kan. 800, Syl. ¶ 1, 494 P.2d 1233 (1972), where we held:

"Where one of the grounds specified in K.S.A. 60-259 . . . is shown to exist, the granting of a new trial rests in the sound discretion of the trial court and an order granting or refusing a new trial will not be reversed on appeal unless a clear abuse of discretion is shown."

We have already disposed of the first and second grounds by our determinations of the preceding issues. We turn then to whether the verdict of $1,018,653 was given under the influence of passion or prejudice and shocks the conscience of the court. It should be noted that the propriety of the $250,000 component part thereof for future medical expense is not before us by virtue of the inadequacy of the record on appeal.

The verdict is large, but the plaintiff, a young man, suffered extremely serious injuries resulting in permanent disabilities. We find no clear abuse of discretion in the trial court's denial of the motion for a new trial.

## COSTS

Bentley's eighth issue is that the trial court made an improper determination of the costs awarded herein to plaintiff.

Following the verdict, plaintiff filed a posttrial motion seeking to have various deposition costs and expenses assessed against the defendants as costs of the action. On December 8, 1987, the court issued its memorandum decision apportioning the costs and expenses to the defendants in proportion to the fault assessed by the jury. A journal entry was later filed.

K.S.A. 60-2002 provides that costs shall be allowed to the party in whose favor judgment is rendered. K.S.A. 60-2003 provides, in part:

"Items which may be included in the taxation of costs are:

. . . .

"(4) Statutory fees and mileage of witnesses attending court or the taking of depositions used as evidence.

"(5) Reporter's or stenographic charges for the taking of depositions used as evidence."

Except where otherwise provided by statute, a trial judge is vested with discretionary authority in taxation of costs in a civil action. *Brown v. Lang*, 234 Kan. 610, 617, 675 P.2d 842 (1984); *Wood v. Gautier*, 201 Kan. 74, Syl. ¶ 2, 439 P.2d 73 (1968). The

appellate standard of review of the taxing of costs is whether there has been an abuse of discretion. *R. B. Enterprises, Inc. v. State*, 242 Kan. 241, 250-51, 747 P.2d 152 (1987); *Negley v. Massey Ferguson, Inc.*, 229 Kan. 465, 472-73, 625 P.2d 472 (1981).

Specifically, Bentley objects to the taxing of certain discovery depositions as costs. These depositions were used in questioning witnesses but were never admitted into evidence.

In *Wood v. Gautier*, 201 Kan. at 79, we said:

"Costs of preparation for trial are not ordinarily recoverable as costs. Discovery depositions by their very nature fall within the realm of trial preparation. We think the distinction implicit in 60-2003 evinces policy which is reasonable and fair. We therefore hold that charges for discovery depositions, not used as evidence, are ordinarily not taxable as costs. Generally speaking, a trial court is vested with a large measure of discretion in the administration of our discovery procedures, and we do not mean to say extraordinary circumstances might not exist wherein a trial court would be justified, in the exercise of sound discretion, in allowing or apportioning the charges of discovery depositions. The burden of proving any such rare exception would, of course, rest upon the party claiming the costs.

"No such situation exists in the case at bar. Defendants suggest the fact two of the depositions were offered in evidence should make the charges for them allowable as costs. To make a mere offer controlling on the question would open the door to possible abuse, that is, permit discovery depositions to be offered in evidence under the guise of impeachment so as to furnish a basis for assessment of costs."

No extraordinary circumstances have been alleged herein for any departure from the general rules relative to assessment of costs. We conclude that the trial court abused its discretion in allowing the charges for discovery depositions not admitted into evidence to be assessed as costs. The trial judge's assessment of costs must be reversed and that aspect of the case remanded for a redetermination thereof consistent with this opinion.

A few other points were tucked into some of the preceding issues. Although these have not been separately discussed herein, each has been examined and is held to be without merit.

## CROSS-APPEAL

### MOTION FOR A DIRECTED VERDICT

For the first issue in his cross-appeal, plaintiff contends the trial court erred in denying his motion for a directed verdict. Specifically, plaintiff sought to remove his own alleged fault from any comparison of fault. Plaintiff contends that his conduct

constituted that of a rescuer under the rescue doctrine and that, further, as a matter of law, there was no evidence he had acted in a rash or wanton manner.

In *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743 (1983), we discussed the rules governing a directed verdict as follows:

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250 the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. *Frevele v. McAloon*, 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977); *Lemley v. Penner*, 230 Kan. 25, 27, 630 P.2d 1086 (1981). The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where that is true, the issue must be submitted to the jury. *Sexsmith v. Union Pacific Railroad Co.*, 209 Kan. 99, Syl. ¶ 3, 495 P.2d 930 (1972). Where no evidence is presented on a particular issue, or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination. *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 411, 580 P.2d 893 (1978); *Southards v. Central Plains Ins. Co.*, 201 Kan. 499, 505, 441 P.2d 808 (1968); *Kemp v. Railway Co.*, 91 Kan. 477, 483, 138 Pac. 621 (1914)." 233 Kan. at 578.

There was conflicting evidence as to precisely what plaintiff was doing immediately prior to being injured. Plaintiff knew the Sawyers vehicle was protruding into the highway. He had concern for oncoming traffic and had directed an individual to stop such vehicles. There was evidence he was standing by the Sawyers vehicle talking to the driver as the Great Plains Chemical Company truck approached—not leaning through the window to assist the child as other evidence would indicate. There was evidence that upon seeing the truck approach, plaintiff "freaked out" and began running. The jury found plaintiff to be 2% at fault. Under the totality of the circumstances herein, and the rules set forth in *Sampson v. Hunt*, we find no abuse of discretion in the trial court's denial of the motion for a directed verdict.

## DISFIGUREMENT

For his second issue, plaintiff contends the trial court erred in refusing to instruct on disfigurement as an element of damages.

There was evidence plaintiff suffered a large laceration on his left thigh and an open fracture of the left humerus. Surgery was required for the treatment of both injuries. No disfigurement from such injuries was described or shown to the jury. Plaintiff contends that disfigurement can be assumed from evidence of such injuries having been sustained and treated surgically. The trial court held that no instruction on disfigurement as an element of damage is proper when there is no evidence that disfigurement resulted. We agree.

That portion of the judgment resulting from the verdict herein is affirmed; that portion of the judgment of the assessing of costs is reversed and remanded for a redetermination thereof which is consistent with this opinion.