No. 86,523

WILLIAM EDGAR WENDT, *Appellant/Cross-appellee*, v. UNIVER-SITY OF KANSAS MEDICAL CENTER, *et al.*, *Appellees/Cross-appellants*.

(59 P.3d 325)

Opinion filed December 6, 2002.

*Arthur A. Benson II*, of Arthur Benson & Associates, of Kansas City, Missouri, argued the cause, and *Aften P. McKinney*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*John C. McFadden*, special assistant attorney general, argued the cause and was on the brief for appellees/cross-appellants David Lewin, Richard Robards, University of Kansas Medical Center, University of Kansas, State of Kansas, and Donald Hagen.

*Patricia A. Sexton*, of Polsinelli Shalton & Welte, P.C., of Kansas City, Missouri, argued the cause and was on the brief for appellees/cross-appellants Irene Cumming and David Cobb.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a retaliatory discharge case in which William Wendt sued his former employer, the University of Kansas Medical Center (KUMC), the University of Kansas (KU), and five individual defendants, Irene Cumming, Donald Hagen, Richard Robards, David Cobb, and David Lewin. The district court dismissed Wendt's 42 U.S.C. § 1983 (2000) claims against KUMC and KU, dismissed the 42 U.S.C. § 1983 claims against the individual defendants in their official capacities, entered summary judgment in favor of Hagen in his individual capacity, dismissed all claims against David Lewin, and entered judgment in favor of defendants on all remaining claims in accordance with a jury verdict.

Wendt appealed. Defendants cross-appealed the district court's denial of their request for certain deposition costs. The case was transferred from the Court of Appeals to this court pursuant to K.S.A. 20-3018(c).

ISSUES:

The issues raised by Wendt's appeal are whether: (1) the district court abused its discretion in admitting evidence of KUMC's internal employment termination appeal process; (2) the district court erred in dismissing 42 U.S.C. § 1983 claims against KU, KUMC, and the individual defendants in their official capacities; and (3) the district court erred in issuing a posttrial ruling on motions taken under advisement during trial that Wendt's evidence would not support an award of punitive damages.

The issue raised on cross-appeal is whether the district court erred in denying defendants' request for certain deposition costs.

Wendt began work at KUMC in 1986. For most of his tenure there, Wendt worked as a biomedical instrumentation specialist (bio-med tech). As a bio-med tech, he was responsible for certain equipment used in surgical procedures, including defibrillators used to revive stopped hearts and balloon pumps used to keep weak hearts beating.

On a number of occasions while Dr. Jon Moran was in charge of the heart transplant program at KUMC, Wendt provided bio-med tech assistance during Dr. Moran's surgeries. Wendt believed that Dr. Moran was a very good surgeon and enjoyed working with

him. In the fall of 1994, Dr. Hamner Hannah replaced Dr. Moran as head of the KUMC heart transplant program. On March 24, 1995, Wendt provided bio-med tech assistance for an unsuccessful heart transplant procedure performed by Dr. Hannah. Wendt later misrepresented that he had personal knowledge that the transplanted heart had required resuscitation while still in the donor. The heart recipient died approximately 2 hours after leaving surgery.

Wendt's contacts with state officials. In March 1996, Wendt anonymously telephoned the Office of Constituent Affairs in the Governor's Office. The person who spoke with Wendt prepared a memorandum from the notes she took during their conversation. Regarding several of the issues Wendt raised, she wrote:

> "They are using doctors from a Hanna group. The doctors are not staying with transplant patients until they are stabilized. Post-operative care was his real concern. The staff they are using are not adequately trained to cope with transplant patients.
>
> "Patients are not getting their transplants in a timely fashion, because they have to wait for the surgeon to finish at another hospital. According to him, the Hanna group served seven hospitals and the Medical Center is bottom on the totem pole. In one instance — in that one instance, that a heart that was harvested from another part of the hospital was Coded and the surgeons still tried to use it for a transplant.
>
> "Last week a liver transplant was done and there were no gloves available and the equipment was not cleaned. Apparently they are getting a new plasma sterilizer, and things were not clean because it was not operational."

After calling several more times in the intervening months, in August 1996 Wendt finally identified himself to the constituent affairs officer. He was asked to put his allegations in writing and mail them to the Office of Constituent Affairs on or before September 3. On August 30, Wendt telephoned the constituent affairs office and demanded to speak to someone else. He did not comply with the request for written allegations. The constituent affairs officer considered the matter closed. She neither contacted anyone at KUMC about the allegations nor had any knowledge that anyone else in the Governor's office did so.

On or before September 2, Wendt telephoned the office of the Attorney General and spoke to Steve Rarrick, who was chief of the

consumer protection division. Rarrick had worked with KUMC during the summer of 1996 to reach an agreement and execute an Assurance of Voluntary Compliance, which was dated August 26, 1996. The document included the following Attorney General's allegations against KUMC of deceptive and/or unconscionable acts in violation of the Kansas Consumer Protection Act:

" 'Respondents willfully failed to state material facts to and/or willfully concealed material facts from patients placed on and/or evaluated for placement on the heart transplant waiting list by failing to disclose material facts regarding the number of donor heart offers being refused for non-medical reasons, the status of the heart transplant program, that heart transplants were limited to in-house donors for a period of time, that no surgeon was available to perform heart transplants for a period of time, and that no surgery was available to perform heart [sic] that prior to the termination of the program the heart transplant surgeon at K.U.M.C. failed to meet the minimum transplant training and/or experience required by UNOS [Unified Network for Organ Sharing] under K.S.A. 50-626(b)[2].' "

When Wendt telephoned the Attorney General's office, Rarrick believed that it was in response to a press conference about the settlement with KUMC. Wendt told Rarrick that he was having an employment dispute with KUMC, and Wendt reported that a heart that had to be resuscitated in the donor was transplanted into another patient, and he believed that criminal charges ought to be considered. Rarrick referred Wendt to Dave Debenham, who was in charge of the Attorney General's criminal division. Rarrick never contacted anyone at KUMC about Wendt's allegations.

After speaking with Wendt, Debenham directed an investigator from the Attorney General's office to contact Wendt in order to get a written statement from him. The investigator made a tape recording of his interview with Wendt and provided the recording to Debenham. Debenham referred the matter to the Board of Healing Arts, which had the technical expertise to determine if there were grounds for Wendt's complaints. Neither Debenham nor anyone else in the criminal division of the Attorney General's office ever contacted anyone at KUMC about Wendt's allegations.

Wendt's employment record with KUMC. Wendt's generally positive employment record with KUMC is punctuated with occasional negative aspects, which became more frequent toward the

end of his tenure. In the resume he submitted with his application for employment at KUMC in 1986, Wendt misrepresented his educational background in order to make it seem as if he had a substantial knowledge of chemistry.

In 1988, a report of employee guidance and discipline was given to Wendt in which the problem was described as follows: " 'Employee lied and disobeyed a direct order issued by department head. Employee has not kept up with training expectations.' " The report included the following comments: " 'Employee admitted wrongdoing. Employee was notified that he will be immediately terminated if he ever lies, disobeys orders, cover[s] up any mistakes or fails in this training expectation.' "

In subsequent annual evaluations, Wendt's technical skills and conscientiousness were praised, but he was admonished to improve his diplomatic skills, his working relationships with other employees, and his negative attitude. In 1993, Wendt's supervisor, David Cobb, commented that "Wendt needs to work on his diplomacy regarding communication with other personnel." In January 1995, Wendt's performance evaluation noted that he needed to "improve his interpersonal skills, example [sic] attitude and arguing with nurses at times, also arguing with co-workers." His supervisor added, "I want to see [Wendt] become a team player and leader in these changing times and have the ability to adapt with a positive and friendly attitude."

In January 1996, Wendt was commended for his ability to work independently, his efforts to improve procedures, and his initiative in continuing his education. His supervisor also stated that Wendt "needs to try and understand that changes are going on in the health care throughout the country. I understand it's hard on everyone, I hope [Wendt] can control his negative attitude through these changes."

The self-review submitted by Wendt in January 1996 is saturated with dissatisfaction. Wendt listed as a significant accomplishment that he "[d]idn't leave with Dr. Moran, didn't run screaming to legislature, regents, press about changes and incidents [he was] present at." A factor he identified as contributing to his accomplishment was "lots of naive hope that things would change."

Wendt listed as a hindrance to his achieving his objectives that his boss told him "we wanted to let patients die on the floor because if we saved them and they went to ICU, we would only have a profit margin of '$2-300 and that is unacceptable.' " Wendt's major goal for the coming year was to "leave KUMC." He explained: "I believe that KUMC is unrecoverable. The incidents I have seen should have cost some people their licenses. My record is clear and of high quality. The record of KUMC administration borders on the criminal. I am not proud to say I'm from KUMC and, in leaving, would join a long list of 'quality' physicians and nurses."

At a department meeting with Lynn Barnes, an outside consultant, on July 26, 1996, Wendt said that KUMC condoned murder and let patients die in the intensive care unit. He stated that Dr. Hannah should be prosecuted for fraud, that the unsuccessful heart transplant surgery constituted plain murder, that there was misuse of certain catheters, and that Dr. Child allowed a trauma patient in ICU to die rather than treating him. When Cobb suggested to Wendt that his concerns ought to be taken up with risk management rather than with the consultant, Wendt became highly agitated and asked, "What are you going to do, fire me?"

After the meeting with the consultant had broken up, Cobb, Rick Robards of KUMC's Human Resources department, and Dr. Craig Heligman met with Wendt. Wendt was asked to put his allegations in writing. After Wendt responded to a page to attend to a patient's need, he met again with Cobb and Heligman. Heligman summarized the second meeting in a letter to Robards as follows: " 'Mr. Wendt made serious allegations concerning inadequate staffing, physician practices, deterioration of ability for KUMC to provide adequate care for patients in several areas, and questioned the validity of the outcome of the investigation surrounding the heart transplant program.' " Heligman also reported: " 'Mr. Wendt explained that he had attempted to contact Dr. Hagen and the governor, but his calls and messages went unanswered.' " Heligman concluded: " 'In order to close the discussion with Mr. Wendt, I advised him to prepare an executive summary no more than five pages with details of the most significant issues he identified. Once that was completed, Dave and I assured him that he would be able

to present the information to a senior KUMC officer such as Dr. Hagen, Dr. Lambson and Ms. Cumming or Dr. Estes. He appeared to be satisfied with that.' "

On August 15, 1996, Robards wrote to Wendt:

"I am writing as a follow up to the meeting you attended on July 25 at approximately 4:30 p.m. in my office. During that meeting Dave Cobb, Dr. Craig Heligman and I listened to you convey a number of general concerns and allegations. We informed you that these seemed to be very serious allegations and should be investigated further. We advised you that in order to properly investigate these matters, we would need additional detail and asked you to document your concerns in writing.

"Approximately one week later, you called my office and spoke to a member of my staff, Mr. Cliff Rovelto. He reported that you called to express your displeasure that 'nothing had happened'. Mr. Rovelto advised you that he had not had any discussion with you concerning these issues, but reminded you that Dave Cobb, Dr. Heligman and I had asked you to detail your concerns and allegations in writing. He then again invited you to document the concerns and send them directly to him. Following your conversation with Mr. Rovelto you contacted Ms. Susan Fry, Chief Operating Officer for [KUMC] Hospital and asked that Mr. Cobb, Dr. Heligman and myself be dismissed. At the conclusion of this conversation, Ms. Fry conveyed the importance of obtaining details relevant to the concerns and once more asked you to document your allegations so that they could be investigated.

"As of this date, you have failed or refused to comply with these repeated requests. Your refusal to cooperate has made it impossible to conduct any investigation into the issues you raised. . . .

"It was my sincere belief that your primary interest was our patients and their families. If such is the case, we are willing to provide you with one final opportunity. If you have documentation or evidence to support your allegations, please provide a signed statement including this documentation to me no later that 5:00 p.m. on Monday August 19, 1996. If you prefer, we will make arrangements for a tape or video recording of your statement. If you wish to pursue this alternative, please contact my office to arrange for a meeting.

"I am sure you are aware that the discussion of unsubstantiated allegations involving patients and or patient care with persons outside administration is inappropriate. I continue to be available to receive any evidence, documents, or detail which would assist us in investigating these matters."

Wendt never complied with the request that he provide written allegations.

Wendt failed to attend a meeting that Cobb arranged between Wendt and Kent Hider of Employee Relations to discuss Wendt's

concerns about comp time. The meeting was to have occurred on September 6.

On September 9, in a patient-care area of the surgical ICU, Wendt inappropriately and in a very agitated manner talked repetitiously in a very loud voice about one of the nurses violating the infection control policy. Wendt did not lower his voice as requested. Investigation of the nurse's conduct revealed no deviation from the protocol.

Robards testified that the purpose of asking Wendt to provide written allegations was to have a document to transmit to Risk Management for investigation. Because Wendt failed to provide written allegations as requested, Cobb directed him in writing to meet with Ruth Kamm, the Risk Manager, on September 10 to discuss his "concerns and allegations." Cobb's letter stated: "The issues you raise are serious and it is imperative that they be investigated. As I am sure you are aware, the best interests of our patients and their families are clearly not being served by your unwillingness to cooperate in investigating this matter." Wendt met with Kamm. He used the medical records to discuss his allegations regarding the unsuccessful heart transplant surgery performed by Dr. Hannah, and he "discuss[ed] the churning of medical equipment." Wendt told Kamm that he had contacted the Governor's Office of Constituent Affairs.

On September 13, Wendt inappropriately spoke in a very loud voice in the operating room to Hayley Hon, a certified surgical nurse. After delivering a doppler probe unit to the operating room as requested, Wendt accused Hon of using unsterile lubricant in inserting the probe through a patient's surgical incision. Hon testified that the prep cart and the gel container are not within the sterile field around the patient, but that the lubricating contents of the gel container are sterile. Proper procedure requires the nurse to transfer some of the sterile gel from its container to a sterile vessel without touching the sterile vessel with the unsterile container. The probe is lubricated from the sterile vessel. Wendt removed the container of lubricant from the prep cart and left the operating room with it. When he returned to the operating room with another container of gel, he was still accusing Hon of using

an unsterile product. She followed him out of the operating room to have a short conversation with him before she returned to the surgery. After the surgery was complete, Hon reported the incident to Marcy Walker, the charge nurse at the nursing desk. It was the first time since Hon began working as a surgical nurse at KUMC in 1986 that she had reported an incident. She reported it because Wendt's loudness and obnoxious manner in the circumstances were inappropriate.

KUMC's written policy for dismissal of permanent employees provides: "When an instance of misconduct or poor job performance is determined to be of a serious nature, the Medical Center may by-pass any or all of the established progressive system of discipline." After the operating room incident, Cobb recommended that Wendt be fired. In accordance with the usual procedure, upon receiving Cobb's recommendation, Robards directed a member of his staff, Kent Hider, to evaluate the situation. Hider's task was to assess whether the recommendation by a department manager was reasonable and whether there was a sufficient basis for termination. After Hider's assessment was complete, he prepared a letter for Robards' signature that informed Wendt of KUMC's decision to terminate him. The letter, which is dated September 30, 1996, states:

"This letter is to notify you of a decision to effect disciplinary action as a result of your inappropriate behavior which resulted in a detrimental effect on the efficiency and morale of employees in the hospital. I would like to review the background and reasons for this action.

"On September 9, 1996, while performing your job assignment as a Biomedical Technologies Technician your confrontational behavior about the isolation techniques of a new nurse resulted in an altercation with the Nurse Manager of SICU. The altercation was loud enough that anyone in the vicinity including patients could easily hear it. Such conduct is unacceptable.

"Previously you have been warned about your abusive and excessively defiant attitude evidenced by your behavior. You have also been advised on numerous occasions, including performance appraisals, that your negative attitude and inappropriate behavior make it impossible for hospital employees to properly discharge their job duties and provide quality patient care. Since you are classified as a professional employee, the administration expects a high degree of discretion in your interaction with other employees. We have no doubt that you understand

that appropriate conduct is required for you as well as other employees of the University of Kansas Medical Center.

"On September 13, 1996 you again exhibited inappropriate behavior when you confronted a staff nurse in the Operating Room about her professional competence in sterilization techniques. This particular incident culminated in the nurse being ridiculed and degraded by your actions during surgery. The inappropriate and unacceptable method in which you approached the situation based on your inaccurate assessment of the medical technique used is another example of your insubordinate behavior and refusal to follow the directives of your supervisor.

"Because of your inappropriate behavior and its effects on other employees, following previous warnings and the opportunity to improve, we are proposing your dismissal effective October 8, 1996. You are relieved of duty with pay pending the outcome of this action."

In the final paragraph of the letter, Wendt was advised that he had a right to appeal: "If you care to exercise that appeal right, you may write within ten (10) days of the effective date of this action, to Mr. Kenton Hider, Employee Relations Manager . . . ."

Wendt wrote a timely appeal letter. In a 7-page memorandum dated October 28, 1996, to Robards, Hider reported what he was told in interviews with a number of KUMC employees and stated that, on the basis of the investigation, he concluded that Wendt's version of the incidents in surgical ICU and the operating room was not credible.

Wendt was informed by a letter dated October 29, 1996, that the decision to terminate him would not be overturned. Wendt then exercised his right to a further appeal of his termination to a three-person KUMC Appeal Board, where he was represented by counsel. The decision to terminate Wendt's employment was upheld by the Appeal Board.

We first consider the district court's admission of evidence of the KUMC's internal employment termination appeal process. The standard of review for a trial court's ruling regarding the admission of evidence, subject to exclusionary rules, is whether the trial court abused its discretion. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 1, 976 P.2d 486 (1999).

Wendt complains of the trial court's admitting into evidence the memo prepared by Hider and addressed to Robards on the investigation conducted upon Wendt's initial appeal of the decision to

terminate his employment. Wendt's counsel objected to admission of the memo on the grounds that it was irrelevant, invaded the province of the jury, and was prejudicial. On appeal, Wendt adds the allegation that the memo constituted improper expert testimony. Wendt further contends that any probative value was outweighed by the prejudicial effect.

In his second amended petition, Wendt alleged that defendants' conduct in terminating him "was willful, wanton, and malicious, and was motivated by evil motive or intent or involved reckless or callous indifference" to his federally protected rights and that the actions of individual defendants "constituted actual malice" toward him.

The trial court gave the following explanation for its admission of the memo: "I've indicated that because you were claiming that the actions of these defendants were willful, wanton, and entitled you to punitive damages, I believe that the process of why they went through this terminating Mr. Wendt is certainly relevant, and you may lay it before the jury, and the jury can decide whether or not the actions were willful and so forth and so on." The trial court on several occasions instructed the jury that the memo was to be considered for a limited purpose:

"[Y]ou are going to be asked to make your own determination about the propriety of termination. Here, you are going to be asked to make that that determination be made based upon the evidence and the instructions that I will give you at the close of the case; and in fact, that the fact that an appeal panel made a determination that upheld the appeal is not relevant on that point. You may consider the appeal process for other issues such as the reasonableness of the process and whether or not the defendant acted in a wilful or wanton manner. And you will be instructed about all of this later on.

"So, with that repetition of a limiting instruction, we will proceed."

Opening the door. KUMC asserts that Wendt and Wendt's witness, John Miller, introduced the subject of the internal appeal process and freely testified about it. None of the transcript references given by KUMC are to testimony about Hider's investigation of allegations made by Wendt in the appeal letter he wrote after receiving Robard's letter. Instead, the testimony is about the separate and somewhat later hearing before a three-person panel,

which was afforded Wendt as a part of KUMC's procedures for unclassified health care employees.

Relevance. Wendt contends that because his termination preceded Hider's memo, the document is irrelevant to the question of whether defendants' action in terminating him was malicious, willful, or wanton. KUMC contends that Hider's memo, which was evidence that the decision to dismiss Wendt was subject to meaningful review and modification and that the first level of the available review was thoroughly investigated, was relevant to counter the allegations of malicious conduct. Relevant evidence means evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). As KUMC contends, Hider's memo tends to show that the decision to dismiss Wendt was thoughtfully and thoroughly investigated at a time when it could be modified.

Province of the jury—credibility of plaintiff. Hider's memo contains this statement: "Based on my investigation, the allegations made by Mr. Wendt regarding the incidents that occurred in SICU and the O.R. do not appear credible and are not supported by the information presented in his written appeal letter." Wendt argues that admission of Hider's memo violated the rule of *Cimarron Feeders v. Bolle*, 28 Kan. App. 2d 439, 17 P.3d 957 (2001), which purportedly prohibits a witness from testifying as to the credibility of another witness' testimony. In fact, the evidentiary issue in *Cimarron Feeders* was an expert witness' giving an opinion on the ultimate issue. Cimarron Feeders' accountant testified that a revised operating agreement and promissory note, from which the dispute arose, was " 'probably fair.' " 28 Kan. App. 2d at 449. The Court of Appeals concluded that the accountant's opinion invaded the province of the jury because the "fairness" of the agreement and note was a matter within the normal experience possessed by jurors. 28 Kan. App. 2d at 449. The Court of Appeals believed that the erroneous expert testimony may have been harmless as an isolated instance but that the totality of circumstances and trial court errors required reversal. 28 Kan. App. 2d at 451.

A case that is closer to the point Wendt attempts to make is *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986), where the court held that it was reversible error for the trial court to have

permitted two expert witnesses to express their views on the reliability of the statements of the complaining witness. The court stated: "[T]he witnesses attempted to serve as human lie detectors for the child and both told the jury that in their professional opinions the child was truthful and the defendant was guilty as charged. We are convinced that it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements." In other cases where one witness had been allowed to comment on the credibility of another, for example, *State v. Mullins*, 267 Kan. 84, 94-97, 977 P.2d 931 (1999), the harmless error rule has been applied.

In the present case, the Hider memo was not offered or admitted as expert testimony. Hider questioned Wendt's position based on his interviews of various hospital personnel. Their statements were summarized in the report. These same employees testified at the trial. In fact, Hayley Hon and Lynn Davis were called by Wendt as part of plaintiff's case. Fellow hospital employees Carol January, Carolyn Werth, Marcie Walker, and Carol Anne Sass testified for the defendants. Hider was not available to testify because he died before trial. Hider's written comment on Wendt's credibility was part of one sentence in a 7-page memo. Wendt has not alleged that he asked the trial court to redact the single phrase "do not appear credible" from the lengthy document. Wendt has not shown that in these circumstances the trial court erred in admitting the document because it contained a comment on his credibility.

Province of the jury—opinion on the ultimate issue. Wendt complains that admission of Hider's memo impermissibly introduced his opinion on the ultimate issue to be decided by the jury, whether his termination was wrongful. Most of the cases cited by Wendt involve traffic accidents and the admissibility of investigating officers' reports. As KUMC notes, an opinion on the ultimate issue was determined to be error in *Cimarron Feeders*. KUMC also observes that in the cases cited by Wendt the opinions were rendered by experts or figures of authority, and in the present case the opinion was that of another KUMC employee.

KUMC cites employment termination cases from other jurisdictions. The cases are *Silva v. Lucky Stores, Inc.*, 65 Cal. App. 4th 256, 76 Cal. Rptr. 2d 382 (1998); *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997); *Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321, 1322 (11th Cir. 1982); and *Crimm v. Missouri Pacific R. Co.*, 750 F.2d 703, 709 (8th Cir. 1984). In these cases, the rulings admitting internal personnel documents were made over hearsay objections. KUMC argues that despite the differing challenges, the rationales for admission in the foreign cases are aptly applied in the present circumstances. Review of the foreign cases, however, shows that to some degree they must be distinguished from the present case. Silva was fired based on the findings of an investigation undertaken by Lucky Stores' human resources representative after a female employee complained that Silva improperly touched her. Wolff was terminated based on memoranda written by supervisors and fellow employees describing specific instances of Wolff's misconduct. Moore was terminated based on memoranda prepared by Moore's supervisors that contained observations pertaining to Moore's performance, summaries of reports on his performance made by other Sears employees, and chronological accounts of events such as personnel investigations and meetings. Crimm was removed from his superintendent's position based on his supervisor's investigative report of an incident of sexual harassment by Crimm.

The hearsay objection in each of these cases was overruled because the reports were not offered for the truth of the matter contained therein. The documents, instead, were offered and admitted to show that there was a basis for the employee's termination other than the alleged improper basis. The Hider memo, which was prepared after Wendt was dismissed, was not the basis on which the dismissal decision was made. For this reason, the rationale of the foreign cases is not strictly applicable. The foreign cases, however, are instructive for their admission of the employers' internal investigative documents. They are not treated, as Wendt would have the court do, like the opinions of experts for evidentiary purposes.

The final argument made by Wendt is that the probative value of the Hider memo was outweighed by prejudice. The balance of

probative value and prejudice generally is left to the sound discretion of the trial judge. Although the Hider memo might be questionably admissible in other circumstances, it was not an abuse of the district court to admit it for the limited purpose set out in instructions to the jury.

We next consider whether the district court erred in dismissing the 42 U.S.C. § 1983 (2000) claims.

Wendt's first amended petition was in two counts, violation of 42 U.S.C. § 1983 and wrongful termination. Both counts were alleged to have arisen from Wendt's communications with the offices of the Governor and the Attorney General. Although Wendt's second amended petition substituted a count of conspiracy to violate 42 U.S.C. § 1983 for the wrongful termination count, it appears from the verdict form that the claim ultimately submitted to the jury was for wrongful termination.

KU and KUMC moved to dismiss Wendt's § 1983 claims against them for failure to state a claim. The trial court granted their motion on the ground that as arms of the State, they could not be sued for monetary damages under 42 U.S.C. § 1983. Wendt contends that the dismissal was improper.

In *Beck v. Kansas Adult Authority*, 241 Kan. 13, 735 P.2d 222 (1987), the court held that KUMC is not subject to a suit for damages under 42 U.S.C. § 1983. The court stated:

"The first claim advanced by the plaintiffs is that the Kansas Adult Authority and the Kansas University Medical Center have violated their civil rights, and for this violation plaintiffs claim monetary damages under 42 U.S.C. § 1983 (1982). The first issue which we face, then, is whether a state agency is considered a "person" pursuant to 42 U.S.C. § 1983 in an action for damages commenced in the state courts. The trial court, as noted above, held that these state agencies were not persons under 42 U.S.C. § 1983, and therefore the trial court sustained the motions to dismiss as to the Section 1983 claims.

. . . .

"We have never held that state agencies were persons under 42 U.S.C. § 1983 for the purpose of suits seeking damages thereunder. The State has consented to suit for damages under the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*, but that act does not contain the consent of the State to the filing of actions for damages against it under Section 1983. (The State of Kansas has not waived its sovereign immunity from suits seeking monetary damages under 42 U.S.C. § 1983.) We have reviewed many of the opinions of our sister state courts dealing

with this issue, and find them sharply divided. A review of those opinions would add length but not substance to this opinion. We have carefully considered the issue, and hold that, while the State of Kansas is a person for the purposes of Section 1983 actions wherein injunctive relief is sought, the State has not waived its sovereign immunity from suits seeking damages under that section. The trial court was correct in dismissing the Section 1983 claims as against these defendants." 241 Kan. at 20-21.

It appears the *Beck* reasoning would also require that KU be determined not to be a "person" within the meaning of § 1983. Thus, the trial court did not err in dismissing these claims as to KU and KUMC.

Wendt does not cite *Beck* or address its holding. Although appellees cite and discuss *Beck* in their brief, Wendt fails even to mention it in his reply brief. In the circumstances, there is no call for the court to reexamine its precedent. An additional reason why the court need not take its consideration of this issue beyond *Beck* is that, had the § 1983 claims been tried, the jury's determination on the wrongful termination count—that Wendt did not meet his burden of showing that his communications with the State offices about alleged misconduct at KUMC was a substantial or motivating factor in the decision to terminate his employment—also would have determined the § 1983 count.

In Wendt's words, "the question of whether the individual defendants . . . could be sued in their official capacit[ies] here is identical to the question of whether Wendt could pursue claims against the University and the Medical Center under § 1983." Thus, the court's decision on this issue, too, is governed by *Beck*.

Wendt's final argument is that the trial court erred in issuing a posttrial ruling on motions taken under advisement during trial that Wendt's evidence would not support an award of punitive damages.

At the close of Wendt's case, defendants requested the trial court to enter judgment for them as a matter of law. The trial court took the matter under advisement. At the close of defendants' case, they renewed the motion for judgment as a matter of law. The trial court again took the matter under advisement. After the jury returned a verdict in favor of the defendants, they asked the trial court to rule on the motions in order to complete the record. The trial court did so.

With regard to Wendt's prayer for punitive damages, the trial court stated:

"Plaintiff failed to present clear and convincing evidence that defendants acted in a willful manner in terminating plaintiff such that it would provide a bases for an award of punitive damages. Even believing plaintiff's claim that he was fired for reporting the items mentioned, there was strong evidence that because of plaintiff's abusive and confrontational interaction with other employees that valid grounds existed to terminate him. In evaluating the evidence the court concludes as a matter of law that plaintiff has not presented 'clear and convincing' evidence that defendants' terminated plaintiff without just cause with an intent to cause injury and harm."

Thus, the trial court concluded that Wendt "failed as a matter of law to provide clear and convincing evidence of his entitlement to punitive damages." Characterizing the trial court's ruling as a directed verdict on the issue of punitive damages, Wendt appeals.

The trial court's posttrial ruling was not a directed verdict. The jury returned its verdict, and it was in favor of defendants. The trial court entered judgment in accord with the jury's verdict. Because the jury rejected all of Wendt's claims, he was not entitled to an award of actual damages. A verdict for actual damages is essential to the recovery of punitive damages. *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 208, 4 P.3d 1149 (2000); K.S.A. 60-3702.

In their cross-appeal, the defendants argue that the district court erred in denying defendants' request for certain deposition costs.

An award of costs in a civil action is discretionary with the trial court. *Bridges v. Bentley*, 244 Kan. 434, 445, 769 P.2d 635 (1989). K.S.A. 60-2002(a) provides: "Unless otherwise provided by statute, or by order of the judge, the costs shall be allowed to the party in whose favor judgment is rendered." K.S.A. 2001 Supp. 60-2003(5) provides that "[r]eporter's or stenographic charges for the taking of depositions used as evidence" may be included in the taxation of costs. This court reviews the trial court's taxing of costs for abuse of discretion.

Appellees urge this court to apply a de novo standard of review to the trial court's taxing of costs in the present case. They contend that the trial court's decision was the result of its misinterpretation of K.S.A. 2001 Supp. 60-2003(5) and that the interpretation of a

statute is a question of law to be reviewed de novo. Their argument is defeated by the wording of the statutes themselves, which places taxation of costs within the trial judge's discretion. The appellate court's task in this circumstance is to review the trial court's action for abuse of discretion.

Defendants Cumming and Cobb sought costs of $3,427.15 for depositions. Duplicating some of the costs sought by Cumming and Cobb, defendants Hagen, Robards, and Lewin sought costs of $6,364.10. That amount included witness fees of $15 for each of 18 witnesses and deposition costs for 16 witnesses.

Denying all other cost requests, the trial court awarded defendants Robards and Lewin $484.75, which represented the cost of taking the deposition of witness Carolyn Werth and the cost of statutory appearance fees to witnesses. No reasons were stated by the trial court for its decision.

Defendants' position is that the trial court is statutorily required by K.S.A. 2001 Supp. 60-2003(5) to award costs for depositions that were read into evidence at trial. The statute relied on, however, is a list of items that are allowable as costs. The mandatory verb "shall" that is found in K.S.A. 60-2002(a) is modified by the phrase "unless otherwise provided by . . . order of the judge." Defendants offer no other reasons why the trial court's decision should be regarded as an abuse of discretion. We find no abuse of discretion in the district court's denial of defendants' request for deposition costs.

Affirmed.

LARSON, S.J., assigned.