NOT DESIGNATED FOR PUBLICATION

No. 108,795

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ANDREW PAULSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed October 23, 2015.
Affirmed.

*Richard Ney*, of Ney & Adams, of Wichita, for appellant.

*Christina Trocheck*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., ATCHESON and BRUNS, JJ.

ATCHESON, J.: Defendant Michael Andrew Paulson suspected his wife Valerie of having an affair. As they were in the process of separating—Paulson had begun moving out of their home—he stabbed Valerie to death and in the same incident seriously wounded their sister-in-law. A Saline County District Court jury convicted Paulson of second-degree murder and attempted second-degree murder at the conclusion of a 2-week trial. On appeal, Paulson has claimed an array of defects in the trial. Although Paulson received something less than a perfect trial, the actual deficiencies did not deprive him of a fair trial. We, therefore, affirm the convictions. See *State v. Cruz*, 297 Kan. 1048, 1075,

1

307 P.3d 199 (2013) ("As we have recognized for decades, '[a] defendant is entitled to a *fair* trial but not a perfect one[.]'") (quoting *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974]).

Paulson also challenges the district court's postconviction orders requiring him to reimburse about $8,200 in attorney fees for the appointed lawyer who represented him through the preliminary hearing and to pay about $18,000 in restitution to the Kansas Crime Victims Fund, his sister-in-law. Paulson has not shown those orders to be improper. So we affirm them, as well.

The parties are familiar with the lengthy pretrial proceedings and the extensive trial evidence generated in this case. We see little purpose in cataloguing that history simply for the sake of doing so. We extract some factual circumstances for context and then add pertinent facts as we discuss each of the points Paulson has raised on appeal.

FACTUAL AND PROCEDURAL BACKGROUND

Paulson has never disputed that he killed Valerie and seriously injured Jessie Putman, his sister-in-law. The State charged Paulson with intentional first-degree murder for killing Valerie and attempted intentional first-degree murder for the injuries to Putman. The incident took place on July 6, 2010, meaning the substantive criminal law in effect then governs rather than the revised criminal code that went into effect the following year.

At trial, the case focused on Paulson's state of mind and whether he possessed the requisite criminal purpose or intent to be found guilty. Both the State and Paulson presented testimony from mental health experts for the jurors' consideration. The district court instructed the jurors only on intentional second-degree murder and attempted intentional second-degree murder as lesser included offenses—a decision Paulson has

2

challenged on appeal. The district court also instructed the jurors they could find Paulson not guilty by reason of mental disease or defect or unqualifiedly not guilty. As we noted, the jurors convicted Paulson of the lesser offenses. The district court imposed sentences of 165 months for the killing of Valerie and 61 months for the attack on Putman to be served consecutively, yielding a controlling 226-month term of incarceration followed by postrelease supervision.

Valerie and Paulson had been married for 20 years and had two sons, Austin and Nathan, who were 14 and 10 years old when their father killed their mother. Valerie had a daughter, Kyrsten, from an earlier marriage. Paulson had adopted Kyrsten, and she referred to him as her father. Valerie home-schooled the children and did not have outside employment. Paulson worked as a field representative for a private company, a job requiring him to travel frequently.

The trial evidence showed that in 2007 or 2008, Valerie had an affair with a man who had worked with Paulson. She accumulated roughly $50,000 in credit card debt during that time. The couple separated briefly then, sought marriage counseling, and reconciled. Paulson took control of the family finances. They sold their home in Lindsborg and purchased a smaller, less expensive house in a nearby community. The marital friction continued.

Paulson suspected Valerie was having another affair. The State's theory of the case had Paulson, armed with a knife, going to the family home to kill Valerie when she returned—a premeditated murder. The prosecutor suggested Paulson's motive lay, at least in part, in the family's deep-seated, conservative religious views in which divorce was anathema. Paulson's explanation at trial had him returning to the family home and hiding upstairs to discover information Valerie might reveal either confirming or refuting his suspicion about the new affair. Paulson did not testify. For the most part, the jurors heard his version of the attack through his out-of-court conversations with the psychologist who

testified at trial as a key part of the defense case. According to that account, Paulson overheard a conversation between Valerie and Putman and a cell phone call between Valerie and her putative lover that in his mind confirmed the affair. But he never described the details of the conversation or of the phone call. Paulson said upon confirming the affair, he lost control, stormed down the stairs, apparently picked up a knife in the kitchen, and attacked Valerie and Putman. As the psychologist recounted Paulson's version, everything appeared to him in "flashes" and he did not have a recollection of stabbing either Valerie or Putman.

Putman testified that she and Valerie arrived at the house in the early evening. Valerie immediately noticed that in some of the family photographs Paulson had pasted pictures of her ex-husband or the man with whom she had earlier had an affair over his own face. Putman looked around to see if Paulson was there but didn't find him. Putman said she and Valerie began straightening up the house and cleaning the kitchen. According to Putman, Valerie spoke briefly about the man with whom Paulson suspected she was then involved. But Putman said the conversation did not relate to the nature of the relationship. Valerie told her the man was going to pay for her divorce. Putman told the jurors she stepped away and did not hear what Valerie said to the man during the cell phone call.

Putman testified she went out the back door to make a call on her cell phone. As she looked back inside, she saw Paulson run from the dining room, through the kitchen, and toward the back bedroom. Putman testified she did not see Paulson pick up anything as he ran toward the bedroom. She then heard Valerie screaming, "Stop, no, Andy, oh [G]od, no, stop." Putman testified she immediately tried to call 911, but the call didn't go through. So she went back inside, encountering Paulson in the kitchen. Paulson immediately stabbed Putman in the abdomen. Putman fled into the backyard. Paulson followed. He continued to stab her in the chest until the two fell into the yard. He then stabbed her in the back. But, as they struggled, Paulson stopped the attack and went back

4

into the house. Putman then succeeded in calling 911 on her phone. As she pleaded for help, Paulson returned, grabbed her cell phone, and began stabbing her again. Putman asked him why he attacked her, and Paulson replied: "[Y]ou're the reason we're getting divorced, you're the reason she is leaving me." She told Paulson that she had never done anything to him. At that point, Paulson stopped and went into the house again. Putman made it to her car and drove away. Putman testified she was struggling to breathe and remain conscious, so she pulled into the parking lot of a building supply store and cried out for help. As store employees called for an ambulance, Putman told an off-duty law enforcement officer at the store that Paulson had stabbed her. Putman was hospitalized for multiple stab wounds to her arms and torso.

When law enforcement officers arrived at the home, Paulson had already fled. They found Valerie's body in the bathtub of the downstairs bathroom. A forensic pathologist later identified 18 stab wounds, including 6 to Valerie's chest, 7 to the right side of her torso, and defensive injuries to hands and arms.

After driving away from the home, Paulson called Kyrsten. She described him as crying very hard and sounding "out of it." He told Kyrsten he had killed Valerie and intended to visit his parents to say goodbye to them. Paulson then asked to speak to Austin and Nathan and told Austin that Valerie and Putnam were dead. As Paulson talked to his sons, Kyrsten called 911 and then tried to reach the family's minister.

The morning after the attack, Paulson was arrested at a café in Bennington, a little town just over 25 miles away. An officer who participated in the arrest testified that Paulson said his wife was having an affair and was going to take his children. But Paulson did not otherwise say anything about the attack on Valerie and Putman. The officer described Paulson as calm and cooperative.

LEGAL ANALYSIS

*Failure to Instruct on Voluntary Manslaughter*

Paulson contends the district court erred in not instructing the jurors they could consider voluntary manslaughter and attempted voluntary manslaughter as lesser included offenses. A district court is obligated to instruct on a lesser offense if a jury reasonably could return such a verdict, looking at the evidence in a light favoring the defendant. K.S.A. 2014 Supp. 22-3414(3); *State v. Simmons*, 295 Kan. 171, 176-77, 283 P.3d 212 (2012). We examine the district court's failure to give a jury instruction through a sequential analysis using the following steps: (1) reviewability considering preservation of the issue at trial and jurisdiction; (2) legal appropriateness of the instruction; (3) factual support in the evidence for the instruction; and (4) harmlessness of any actual error. *State v. Brown*, 300 Kan. 542, 554-55, 331 P.3d 781 (2014); *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Tracking those requirements, Paulson plainly preserved the issue for appellate review. His lawyer requested jury instructions on voluntary manslaughter and attempted voluntary manslaughter based on heat of passion. The propriety of the instructions was argued at length to the district court. And Paulson's lawyer objected to the district court's ultimate determination not to give the instructions.

At the time Paulson killed Valerie and injured Putman, the crime of voluntary manslaughter included "the intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). And the crime amounted to a lesser degree of intentional first-degree murder. *State v. Gallegos*, 286 Kan. 869, 873-75, 190 P.3d 226 (2008). The Kansas Supreme Court has also recognized attempted heat-of-passion voluntary manslaughter to be a valid crime consistent with the elements of the

6

completed offense outlined in K.S.A. 21-3403. *State v. Gutierrez*, 285 Kan. 332, 344, 172 P.3d 18 (2007). The requested instructions, therefore, were legally appropriate.

Factual appropriateness is another matter, and Paulson's argument falters there. Heat of passion requires an emotional stimulus of such magnitude to prompt an ordinary person to kill spontaneously and, thus, without premeditation or specific intent. *State v. Bailey*, 256 Kan. 872, 886, 889 P.2d 738 (1995) (The stimulus must cause "'an ordinary man to lose control of his actions and his reason.'"); *State v. McClanahan*, 254 Kan. 104, 114, 865 P.2d 1021 (1993) (heat of passion entails "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action'"). The furor effectively mitigates the calculation and evil-mindedness required for murder with a hot-blooded loss of reason and control—a mental state the law finds less blameworthy. But the requisite stimulus must be sudden and extreme. Tribulations, annoyances, and vexations don't clear that formidable barrier. The mental disintegration required for heat of passion goes beyond mere upset or anger. The measure is an objective one, considering what would unhinge "an ordinary person." *State v. Follin*, 263 Kan. 28, Syl. ¶ 2, 947 P.2d 8 (1997). So a defendant's particular susceptibility to even extreme emotional distress in some circumstances would not be a consideration in gauging the appropriateness of an instruction on voluntary manslaughter. 263 Kan. at 33-34.

To warrant a jury instruction on a lesser offense, a defendant must point to record evidence that, if believed, would permit jurors to return a guilty verdict on that offense. *State v. Hill*, 290 Kan. 339, 355-56, 228 P.3d 1027 (2010). The parties and the district court have characterized the question as whether there was sufficient "legal provocation" to justify an instruction on heat-of-passion voluntary manslaughter.

In framing the issue that way, the parties and the district court have, in our view, incorrectly treated it as bearing on the legal appropriateness of the instruction rather than on factual appropriateness. A legally inappropriate instruction would lack relevance to

the contested issues in a case under any factual scenario. For example, compulsion is not a defense to murder. K.S.A. 2014 Supp. 21-5206(a). So even if the evidence indicated such coercion, no instruction should be given because it would be legally inappropriate. Here, however, an instruction on voluntary manslaughter would be legally appropriate as a lesser degree of criminal homicide. The question is whether the facts—what has been characterized as the "legal provocation"—would justify the instruction. If the evidence does not rise to that level, then the instruction would be factually inappropriate. In this case, the pigeonhole makes no real difference to the analysis of appropriateness.

Based on the record evidence, an instruction on voluntary manslaughter was factually inappropriate because the circumstances immediately preceding Paulson's attack on Valerie and Putman did not entail the sort of exceptional stimuli required. Paulson did not identify particular statements in the conversation between Valerie and Putman that would satisfy that standard. Putman's version of the conversation did not. Paulson likewise could recount nothing specific from the telephone call between Valerie and the man with whom he suspected she was having an affair. At best, the evidence simply showed that in some undefined, generic way those discussions confirmed for Paulson that Valerie had been seeing someone else. The information may have been disappointing, disturbing, and even distressing to Paulson. But that is not the test. Oral confirmation of a suspected adulterous relationship, without something more, does not induce in a reasonable person a complete loss of control accompanied by vehement emotion keying the unchecked urge to kill so as to mitigate a murderous attack. And that is the test.

The parties have pointed us to no factually comparable Kansas cases. But modern case authority commonly finds no mitigation in those circumstances. *People v. Chevalier*, 131 Ill. 2d 66, 75-76, 544 N.E.2d 942 (1989) (rejecting argument "that a confession of adultery by a spouse is legally adequate provocation" for voluntary manslaughter); *Commonwealth v. Mercado*, 452 Mass. 662, 671-73, 896 N.E.2d 1262 (2008) (oral confirmation of suspected affair not "'sudden discovery'" and, thus, insufficient to

8

mitigate murder); *State v. Terrion*, No. 25368, 2011 WL 3300692, at *3-4 (Ohio App. 2011); *State v. Cooley*, 342 S.C. 63, 68, 536 S.E.2d 666 (2000); see LaFave, 2 Subst. Crim. Law § 15.2(b)(6) (2d ed. 2003) ("[A] sudden confession of adultery by a wife . . . has sometimes been held to constitute a provocation[.]"). That view, however, is not universal. *Villella v. State*, 833 So. 2d 192, 196-97 (Fla. Dist. App. 2002) (wife's confirmation of affair to husband, who had suspected adulterous relationship, properly considered as evidence mitigating murder charge).

Paulson argues *State v. Johnson*, 290 Kan. 1038, 236 P.3d 517 (2010), as analogous authority. But the analogy is, at best, strained. In that case, Johnson suspected his common-law wife of having an affair with another man. Their relationship had been rocky for some time. A coworker suggested to Johnson that his suspicion was correct. Johnson left work early, returned home, and killed his wife with a shotgun. He turned himself in to the police. In Johnson's version of the shooting, he was contemplating suicide. He and his wife talked about their deteriorating relationship and the likelihood they would separate. They agreed to meet with his therapist that evening. Then, according to Johnson, his wife stated she needed "'closure'" and confirmed she had been involved with another man. 290 Kan. at 1040. Johnson said he told his wife he didn't want to hear any more. But she identified her lover and began to describe the details of their assignations. According to Johnson, everything went black. Then, in response to a noise at the front door, he opened his eyes, looked around, and saw his wife lying dead on the floor with a shotgun wound to her chest.

The State charged Johnson with premeditated first-degree murder. At trial, the district court instructed the jurors on voluntary manslaughter based on heat of passion but specifically declined to instruct on a sudden quarrel. The jury convicted Johnson as charged, and his sole point on appeal was the failure to instruct on sudden quarrel as an alternative basis for voluntary manslaughter. The Kansas Supreme Court affirmed for two reasons. The district court correctly concluded that, even on Johnson's version of the

9

events, there was no evidence of a sudden quarrel. 290 Kan. at 1048. Moreover, the instruction defining what constitutes heat of passion was broad enough to encompass a spontaneous, vehement argument, so the omission of language specifically mentioning a sudden quarrel would not have been prejudicial. 290 Kan. at 1048.

Paulson invites us to see in *Johnson* authority for the proposition that confirmation of an adulterous affair is sufficient emotional stimulus to require instructing a jury on heat-of-passion voluntary manslaughter. We decline the invitation. The issue was not before the court in *Johnson*, and nothing in the decision even implicitly endorses what Paulson would have us draw from it. The *Johnson* court merely assumed (without deciding) that a jury instruction on heat-of-passion voluntary manslaughter was legally and factually proper. See 290 Kan. at 1044-48. Given that assumption and the content of the instruction, Johnson had identified no prejudice in omitting language on sudden quarrel. More significantly, *Johnson* is distinguishable on the material facts. Not only did Johnson's wife confirm his suspicion about her affair, she started recounting intimate details of the relationship despite his plea that she not. According to Johnson, that's when he spun out of control. Paulson presented no comparable evidence and could not recall any specifics of the conversations he overheard between Valerie and her paramour or Putman.

Paulson also cites three cases from other states to support his claim for a voluntary manslaughter instruction. But those cases do not help him appreciably. In *Commonwealth v. Schnopps*, 383 Mass. 178, 417 N.E.2d 1213 (1981), the Massachusetts Supreme Judicial Court reversed Schnopps' murder conviction in the shooting of his estranged wife and found the trial judge erred in failing to instruct on voluntary manslaughter given the provocative statements she made to Schnopps immediately before her death. The marriage was foundering. Schnopps' wife had moved out of the house. Schnopps asked her to come over so they could discuss their deteriorating relationship. He later said he sought to persuade his wife to reconcile. The discussion, however, escalated into an

10

argument. According to Schnopps, his wife declared she wanted a divorce in which she intended to get custody of their children and to take all of their possessions leaving him with nothing. Again, according to Schnopps, she then pointed to her pubic area and said, "'You will never touch this again, because I have got something bigger and better for it.'" 383 Mass. at 180. Schnopps contended "his mind went blank." 383 Mass. At 180. He then grabbed a pistol he had purchased the day before and shot both his wife and himself. At trial, Schnopps submitted he first learned of his wife's adulterous relationship during the argument. Circumstantial evidence indicated Schnopps, at the very least, suspected an affair well before then. As we have indicated, the Massachusetts courts recognize that "a sudden admission of adultery" may be "sufficient evidence of provocation" to warrant an instruction on heat-of-passion voluntary manslaughter. 383 Mass. at 181. Considering that standard in light of the trial record, the court held that the jurors should have been instructed on voluntary manslaughter and allowed to resolve the apparent conflict between Schnopps' testimony of suddenly revealed adultery and the circumstantial evidence indicating otherwise. 383 Mass. at 181-82.

The Massachusetts Supreme Judicial Court has since described its decision in *Schnopps* as a "narrow" one based on its facts. *Commonwealth v. Dustin*, 391 Mass. 481, 487, 462 N.E.2d 108 (1984). Even under the legal rule recognized in Massachusetts, Paulson offered no evidence supporting a sudden revelation of adultery. He contends something that was said, though he apparently couldn't recount what, confirmed his suspicion Valerie was having an affair. The evidence was undisputed that Paulson suspected the affair before he entered the house. So in that regard, the record would not have warranted giving a voluntary manslaughter instruction under the Massachusetts standard. Moreover, whatever the information imparted to Paulson, it lacked the incendiary character of the statements Schnopps ascribed to his wife.

In *Haley v. State*, 123 Miss. 87, 85 So. 129 (1920), Haley fatally shot Melvin 2 days after his wife told him she had a sexual relationship with Melvin and a day after she

said Melvin had been boasting around town about carrying on with Haley's adult daughter from a previous marriage. Haley argued temporary insanity attributable to how he reacted to the revelations given his already high-strung nature. The jurors rejected the State's pitch for murder and Haley's pitch for insanity—they convicted on voluntary manslaughter. On appeal, the court found the dual disclosures Haley's wife made to him sufficient to support the verdict based on heat of passion. The court also held the lapse of time between the revelations and the shooting posed a question for the jurors in considering whether there had been a cooling off period dissipating the loss of control required for voluntary manslaughter. 123 Miss. at 104-07. In *Haley*, the emotional stimulus was greater than what Paulson could demonstrate, particularly in light of social mores a century ago.

Even more readily distinguishable is *Bays v. The State*, 50 Tex. Crim. 548, 552, 99 S.W. 561 (1907), in which Bays' wife told him that McLeroy, his brother-in-law, "had come to her bed and threatened to cut her throat if she did not submit" and that so threatened, she did. Bays then went to the house where McLeroy was staying and fatally shot him. Earlier that day, Bays' grandmother suggested to him that something seemed wrong between his wife and McLeroy, but she offered no further explanation. The appellate court held that the jury should have been instructed on voluntary manslaughter and reversed Bays' conviction for murder. 50 Tex. Crim. At 552. The emotional stimulus was the admission of Bays' wife that his brother-in-law had recently raped her.

To reiterate, we find the trial evidence taken favorably to Paulson did not factually support a jury instruction on heat-of-passion voluntary manslaughter. The record does not portray the sort of overwhelming emotional stimulus that would both cause an ordinary person to lose any sense of control and precipitate a concomitant homicidal rage or fury.

The district court, however, declined to instruct on voluntary manslaughter on the notion that "mere words" cannot, as a matter of law, sufficiently enflame the emotions to

mitigate an otherwise intentional killing. The Kansas appellate courts have said a sufficient emotional stimulus must go beyond "mere words or gestures." *State v. Brown*, 285 Kan. 261, 301, 173 P.3d 612 (2007); *McClanahan*, 254 Kan. at 114. But that is really a shorthand version of the actual rule: "Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014); *State v. Guebara*, 236 Kan. 791, 797, 696 P.2d 381 (1985) (stating rule using phrase "however insulting"). The standard, thus, excludes words that amount to insults or epithets rather than verbal descriptions of factual circumstances that could induce heat of passion. See *Mercado*, 452 Mass. at 671 (words may be sufficient emotional stimulus when they "convey inflammatory information to the defendant"); 2 Subst. Crim. Law § 15.2(b)(6) (noting trend in caselaw recognizing that words conveying information of a fact that would constitute provocation supporting manslaughter may themselves be sufficient). Thus, one spouse's graphic description of sexual encounters with a lover conveyed to the other spouse, though "mere words," would entail the sort of circumstance likely creating a jury question on voluntary manslaughter, especially if the communication were revelatory rather than confirmatory and were conveyed in a taunting or provocative manner. 2 Subst. Crim. Law § 15.2(b)(6). Although the district court misconstrued Kansas law applicable to voluntary manslaughter, it reached the correct result given the trial evidence. We may affirm that result based on another legally sufficient reason. *State v. Garcia-Barron*, 50 Kan. App. 2d 500, 506-07, 329 P.3d 1247 (2014).

*State's Closing Argument*

Paulson alleges the prosecutor made numerous improper statements to the jurors during closing argument. Although the prosecutor did overstep in arguing the case, the district court sustained objections to some of the comments, substantially mitigating potential prejudice. As we explain, the problems with the argument were not so severe they deprived Paulson of a fair trial.

Kansas courts use a well-recognized, two-step test for measuring the impropriety of closing arguments in criminal cases:

> "'First, the appellate court must decide whether the comments fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. Second, if the prosecutor has exceeded those bounds, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury to the extent the defendant was denied a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009) (outlining mode of analysis); see *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (noting considerable range permitted advocates, including prosecutor, in arguing their causes in jury summations).'" *State v. Franco*, 49 Kan. App. 2d 924, 938, 319 P.3d 551 (2014) (quoting *State v. Schreiner*, 46 Kan. App. 2d 778, 793-94, 264 P.3d 1033 [2011], *rev. denied* 296 Kan. 1135 [2013]).

If the argument falls outside what is proper, the courts then look at three factors to assess the degree of prejudice:

> "'(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22-24,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error . . . changed the result of the trial], have been met. [Citations omitted.]'" *State v. McReynolds,* 288 Kan. 318, 323, 202 P.3d 658 (2009).

The Kansas Supreme Court has recently reiterated this test. See *State v. Barber*, 302 Kan. 367, 378-79, 353 P.3d 1108 (2015); *State v. De La Torre*, 300 Kan. 591, 608, 331 P.3d 815 (2014).

•Paulson complains that the prosecutor argued Valerie denied having an affair perhaps because she feared him. Paulson contends there was no evidence to support the idea that the denial was the result of fear. During the State's closing argument, Paulson objected to this statement, and the district court sustained the objection. There was some evidence, including testimony from Kyrsten, that Paulson had become angry with and verbally abusive of Valerie in the past when confronting her about marital infidelity.

For purposes of analyzing the issue, we assume without deciding that the prosecutor's suggestion of fearfulness ventured from the realm of permissible inference into the realm of unsupported speculation. The argument doesn't appear gross or flagrant or the product of ill will. The prosecutor did not repeat the inference. Nor was the point wholly divorced from the evidence. The district court's ruling sustaining the objection avoided material prejudice to Paulson. See *State v. Williams*, 299 Kan. 509, 560, 324 P.3d 1078 (2014) ("appellate courts presume that the jury followed the [district] court's admonition").

•Paulson contends the prosecutor impermissibly characterized a document taken from his computer as reflecting his personal views rather than as a lesson prepared for a church Bible study class. The 1-page typed document entitled "Personal Victory – Living by Principle" was admitted as part of the State's case. Written in the first person singular, the document describes briefly the role of God, religion, and the church in various matters including marriage. The document, in part, states: "Divorce is not an option, unless she cheats, and then remarriage is not an option—better work it out!" It adds: "If she leaves in wickedness, maybe God will kill her." The evidence indicated the document was prepared long before Valerie's death.

The evidence showed Paulson to have been very active in his church. Consistent with the church's tenets, Paulson was portrayed as believing divorce to be sinful. One of the State's themes cast Paulson as having resorted to murder as a way out of his marriage

15

to Valerie. And the prosecutor argued "Personal Victory – Living by Principle" supported that motive. See *State v. Carapezza*, 286 Kan. 992, 999, 191 P.3d 256 (2008) (The State may present evidence establishing motive, even though motive is not an element of the charged crime.). The defense, however, described the document as an outline for a Bible class and nothing more.

The document itself might fairly be characterized as ambiguous in that respect. It could be a personal statement of religious belief. It could be a lesson plan. Or it easily might be a combination, especially on the notion that Paulson would draw on his personal religious views in shaping the content of a Bible lesson he intended to teach. Regardless of the way the parties sought to label the document, Paulson apparently composed it on his computer and then retained it.

Paulson objected to the prosecutor's argument as lacking a factual foundation. The district court did not directly rule on the objection but told the jurors to disregard statements of counsel unsupported in the evidence, reiterating part of one of the written instructions.

Under the circumstances, we do not see the argument as going beyond a fair inference from the evidence. After all, Paulson wrote in it the first person, thus indicating a direct personal connection to the content. And while that might have been nothing more than a rhetorical device, a reader could reasonably conclude otherwise. The prosecutor properly could point out as much to the jurors. Even if the argument overstepped the evidence, the prosecutor's point was to show a possible motive, and that motive, in turn, primarily supported the element of premeditation necessary to convict Paulson of intentional first-degree murder. That is, Paulson plotted, however briefly, to kill his wife because he couldn't divorce her. But the jury acquitted Paulson of first-degree murder. So if there were any unfair prejudice, it must have been minimal.

16

•In her closing argument, the prosecutor pointed out the evidence showed Paulson spent much of the night before his attack on Valerie and Putman praying. The prosecutor then asked rhetorically if Paulson were praying for God to kill his wife. Paulson objected to the comment, and the district court sustained the objection. There was trial evidence, albeit disputed, that Paulson had told Valerie he had prayed that God kill her. We assume the argument to be improper, though grounded in the record, given its rather inflammatory tenor. *Cf. State v. Gammill*, 2 Kan. App. 2d 627, 631, 585 P.2d 1074 (1978) (referring to defendant as "an animal" in closing argument "definitely improper"). The comment was barbed and sarcastic and should garner no plaudits for professional or dignified argument. But it functioned more as an oratorical roman candle than a deceptive twisting of the facts or the law in a way that would have materially misled the jurors. In sustaining the objection, the district court substantially neutralized whatever improper negative effect the comment might have had.

•The prosecutor told the jurors they could use their "common sense" to conclude that Paulson stabbed Valerie after he attacked Putman because dried blood found on the knife blade contained predominately Valerie's DNA. Given Paulson's actions during the attack, as Putman described them, the argument presumably supports premeditation and an intent to kill. Paulson first went after Valerie in the house and then assaulted Putman outside. He then went back inside, returned to continue stabbing Putman, and again returned to the house. From that sequence and the blood on the knife, the prosecutor essentially asked the jurors to infer Paulson must have stabbed Valerie again after going back into the house.

Paulson contends the prosecutor's appeal to common sense is wholly unfounded because the conclusion basically contradicts testimony the State's expert witness on blood evidence gave during a pretrial motions hearing. According to Paulson, the prosecutor knew the argument to be without a reasonable factual basis, making it improper.

17

Unfortunately, the evidentiary record isn't nearly as tidy as our summary of the issue might suggest.

At the pretrial hearing, James Newman, a forensic scientist from the Kansas Bureau of Investigation, testified regarding DNA analysis of blood found on the knife Paulson used to kill Valerie and wound Putman. Newman briefly described his expertise as forensic biology and DNA analysis. As the hearing unfolded, Newman went on to say he has training and field experience in determining how blood may have been deposited on objects or spread at crime scenes.

In this case, Newman examined blood and other physical evidence at Putman's home the day after the incident. Newman later took a swab or sample from a blood smear on the blade of the knife and compared the DNA it contained to known DNA from Valerie and Putman. Newman identified only Valerie's DNA in the sample from the knife. He could not find Putman's DNA. We gather Newman submitted a written report before trial that included those findings.

At the hearing, Newman testified that he could not say only Valerie's blood was on the knife blade. Putman's blood could have been somewhere on the blade he didn't sample. Also, if the sample were upwards of 90 percent Valerie's blood, Putman's blood probably would not be detectable in a DNA analysis, according to Newman. In response to questioning from Paulson, Newman testified that he could not say to a reasonable degree of professional certainty that Valerie was the last person stabbed with the knife based on the absence of Putman's DNA in the sample. Newman testified that considering physical evidence—such as the amount of blood at the crime scene, the depth of the wounds to the victims, and other factors—he could offer possible or probable scenarios about who was last stabbed.

Paulson asked the district court to enter an order precluding Newman from testifying as to blood pattern evidence or who might have been stabbed last, since his report did not include those topics and his testimony failed to establish sufficient foundation for an expert opinion. The district court ruled that Newman's trial testimony would be confined to the topics addressed in the report. In ruling on the permissible scope of Newman's testimony, the district court also agreed the lawyers could argue to the jury based on reasonable inferences drawn from the evidence—essentially a legal truism. But the district court did not elaborate on how that might limit their approach to the blood evidence.

In light of the hearing record, the prosecutor's argument to the jurors impermissibly suggested common sense could guide them to conclude from the blood evidence that Paulson stabbed Valerie both before and after he stabbed Putman. Newman's hearing testimony established two bases rendering the argument improper. First, the absence of discernible amounts of Putman's DNA in the blood sample from the knife blade doesn't scientifically support that conclusion. The jurors' common sense can't be substituted for what is scientifically correct. And on this matter, Newman's expert assessment of what the blood evidence establishes is uncontroverted. Second, Newman's pretrial testimony shows that assessing the blood evidence to determine whether Valerie or Putman was the last stabbed demands a skilled analysis integrating all kinds of factual variables. It seems to be far from commonsensical. Moreover, no expert either at the pretrial hearing or at trial suggested determining the order in which multiple victims might have been stabbed requires only common sense.

This isn't a case in which qualified experts have offered conflicting conclusions drawn from the same evidence, leaving the jurors to fashion a credibility determination. In that situation, a lawyer properly could argue the jurors use their common sense in gauging the experts' relative credibility. But the lawyer could not tell the jurors to disregard the expert testimony and to use their common sense to come to their own

19

conclusions about what the evidence shows. For example, it would be improper for a plaintiff's lawyer in all but the most unusual medical malpractice case to tell the jurors they should be guided by their common sense in finding the defendant physician negligent. The prosecutor marched quite away down that path—too far, as we see it.

We turn to the question of prejudice. Paulson's lawyer lodged a timely objection to the argument. The district court told the jurors to disregard arguments not supported in the evidence, an admonition that didn't really deal with the nature of the problem. It's not that the prosecutor's argument misstated a factual predicate—like telling the jurors the surgeon left a sponge in the patient, when the evidence showed all of the sponges had been accounted for. It didn't. The problem lay in telling the jurors they ought to draw particular conclusions from the facts using their common sense when they couldn't because the conclusions demanded specialized skill and training, *i.e.*, expertise regular folks just don't have. In addition, the prosecutor continued the argument even after the district court's admonition.

But we cannot say the argument was truly "gross and flagrant" or was indicative of especially "ill will." The district court's ruling at the pretrial hearing didn't directly address the argument at all, let alone preclude it. Even the district court's comment in response to Paulson's objection during the argument didn't actually amount to a ruling. It was advice to the jurors that in context added up to a non sequitur. The prosecutor didn't offer the "last-stabbed" argument as refrain throughout her presentation to the jurors or as a predominate theme woven into the State's case. The prosecutor briefly made the point among many others in a long, sometimes contentious trial. Nonetheless, the argument appears to have been a calculated one rather than an improvisation made in the flow of unscripted drama common to litigation. On balance, those circumstances dampen considerably any compelling characterization of the argument as gross and flagrant or malevolent.

20

Finally, we are not prepared to say this confined (though improper) argument carried such importance or impact in the scope of the overall case as to sway the jurors to convict. That really is the essence of the third criterion in assessing the prejudice of an impermissible component of a prosecutor's closing argument.

Although the argument speaks to the specific intent to kill, as Paulson says, the principal point goes more to premeditation. To that extent, the jurors obviously were unswayed, since they acquitted Paulson of first-degree murder and attempted first-degree murder. Other evidence weighs against the argument. For example, in Putman's account of Paulson's attack, he abruptly stopped stabbing her when she told him she had done nothing to hurt him. Paulson then went back inside the house, leaving Putman plainly still alive in the backyard. That suggests dissipation of an intent to kill. So Paulson may have returned to the house to confirm what he had done to Valerie and, seeing her dead, fled. The verdicts are fully consistent with such an interpretation of the evidence—an interpretation contrary to the prosecutor's improper argument.

During the trial, key evidence on Paulson's state of mind, broadly encompassing both premeditation and intent to kill, came from the expert psychologists the State and the defense presented. We have scarcely mentioned that testimony because Paulson has raised no issue on appeal directly bearing on that evidence. Both psychologists had impressive credentials and considerable experience in making forensic evaluations. They provided respective cornerstones of the State's case for conviction as charged and the defense case for mitigation or acquittal. And their dueling presentations offered the jurors a classic battle of the experts. Considered against that background, the prosecutor's argument inviting the jurors to speculate about the blood on the knife would have had little, if any, significance.

That also underscores a related point in assessing the impact of the argument. The jurors heard about 2 weeks of evidence in what was a thoroughly and capably tried case.

21

They had all kinds of testimony and hundreds of exhibits to evaluate. This particular argument was a passing pitch to draw an inference that the jurors lacked the expertise to make and that didn't necessarily square up with some of the evidence, notably Putman's eyewitness account. The verdicts do square up more with the evidence and less with the prosecutor's brief, improper argument. Accordingly, we find no reversible error.

*Evidence of Paulson's Religious Beliefs*

Paulson contends the district court erred in admitting evidence of his religious tenets and those of the church he attended, particularly bearing on marriage and divorce, because the information was irrelevant or, if relevant, unduly prejudicial. The point plays out along the same lines as Paulson's challenge to the prosecutor's comments in closing argument. Paulson says the "Personal Victory – Living by Principle" document should not have been admitted. And, he says, testimony from Kyrsten about his religiously based views regarding men as heads of households and women as caretakers to their husbands and children was irrelevant. Paulson contends the evidence unfairly depicted him "as a religious extremist" in front of the jurors. As we have indicated, the State offers a motive for Paulson's killing of Valerie rooted in his inability to obtain a divorce or then remarry without violating the religious doctrines of his church.

As a general matter, relevant evidence should be admitted at trial. K.S.A. 60-407(f). A district court, however, may exclude relevant evidence if its potential for unfairly prejudicing the jurors outstrips its probative value. *State v. Huddleston*, 298 Kan. 941, 961-62, 318 P.3d 140 (2014).

A district court's decision to admit or exclude evidence will be reviewed on appeal either as a matter of law without deference if the ruling is based on materiality or as an abuse of discretion if it is based on probativeness. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 1, 303 P.3d 680 (2013); see also *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352

22

(2010) (An appellate court reviews de novo a contested determination of materiality.); *Wendt v. University of Kansas Med. Center*, 274 Kan. 966, 975, 59 P.3d 325 (2002) (A decision to admit or exclude a particular piece of evidence that is otherwise material largely rests in the trial court's sound discretion.). The Kansas Supreme Court has succinctly laid out the general rule this way:

> "When reviewing a district court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless statutorily prohibited. Evidence is relevant if it has any tendency in reason to prove any material fact. Accordingly, there are two elements of relevancy: a materiality element and a probative element. Materiality addresses whether a fact has a legitimate and effective bearing on the decision of the case and is in dispute. Evidence is probative if it has any tendency in reason to prove a fact. An appellate court reviews a district court's determination that evidence is probative for abuse of discretion whereas the district court's decision regarding materiality is reviewed de novo." *Boleyn*, 297 Kan. 610, Syl. ¶ 1.

A district court abuses that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

As we have pointed out, motive is relevant in a criminal prosecution. And the State, therefore, may offer otherwise admissible evidence to prove motive. *Carapezza*, 286 Kan. at 999. Here, the evidence showed that Paulson was concerned about the position his church took on divorce and how his fellow congregants might react were he to divorce Valerie. So the State wasn't simply conjuring up a strange motive as a device to introduce otherwise irrelevant, though highly prejudicial, evidence. In short, the

23

evidence bore on a legitimate theory of motive for Paulson's killing of Valerie with Putman as an unfortunate secondary victim.

Paulson cites *State v. Leitner*, 272 Kan. 398, 34 P.3d 42 (2001), and *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992), on which *Leitner* relies, as support for the inadmissibility of his religious beliefs about marriage and divorce. But they don't advance his position. In *Leitner*, the court held that the district court impermissibly allowed the prosecutor to cross-examine Leitner about her membership in a Wiccan church—what the decision characterized as a pagan religion— because it had no bearing on the charge against her. 272 Kan. at 414-15. Leitner had shot and killed her ex-husband. She testified he physically abused her during and after their marriage. And she said she shot him while he was beating her. The prosecutor raised Leitner's affiliation with Wicca to suggest her ex-husband had abused her because he didn't want her involved in witchcraft. The court dismissed the theory as "ludicrous," especially since the reasons for the beatings were immaterial. 272 Kan. at 415. The court rather unsurprisingly recognized that the State could not gratuitously explore a defendant's religious beliefs in a criminal prosecution but no absolute barrier precluded the introduction of such evidence if it were otherwise relevant to a disputed issue. 272 Kan. at 414.

The *Dawson* decision similarly determined that the government violated a criminal defendant's right of association protected in the First Amendment to the United States Constitution by introducing evidence of his membership in a white supremacist organization when that information had nothing to do with the contested issues. 503 U.S. at 167. But the Court also made clear that notwithstanding the constitutional protections for associational rights, evidence of a defendant's membership in particular organizations could be admitted if otherwise relevant. 503 U.S. at 165.

Here, Paulson's religious views and those of his church on marriage and divorce were relevant. Although many theologians and practicing Christians might consider those views to be unappealingly conservative or rigid, they are not so unorthodox as to spark impermissible prejudice against Paulson among the jurors. Paulson far overstates the case to suggest those views paint him as a "religious extremist." More to the point, the evidence had relevance that exceeded any potentially improper prejudice.

As we explained in discussing the prosecutor's closing argument, the evidence tended to establish a motive that necessarily entailed premeditation. On the State's theory, Paulson considered those religious tenets, among other things, and concluded killing Valerie offered an option preferable to divorcing her. That's a thought process adding up to premeditation. But the jury acquitted Paulson of intentional first-degree murder. So we fail to see material prejudice to him, even if the evidence were improperly admitted. Paulson has failed to demonstrate a sound basis for reversing his convictions on this score.

*Valerie's Out-of-Court Declarations*

Paulson contends the district court erroneously permitted various witnesses to testify at trial to things Valerie said to them about the state of her marriage and her perception of how he treated her. Paulson would classify those statements as inadmissible hearsay. One key statement fell within a recognized statutory exception to the hearsay rule. In light of the extraordinarily broad common-law exception to the hearsay rule the Kansas Supreme Court has recognized for evidence of "marital discord," we must also say the bulk of the other statements were admissible. Even if the evidence were erroneously admitted, it did not deprive Paulson of a fair trial.

25

This issue at hand turns on the admissibility of proffered evidence and is governed by the same standards as Paulson's challenge to the State's use of evidence concerning his religious beliefs.

Hearsay is generally considered unreliable and, therefore, inadmissible because the person making the statement—the declarant—does not appear in court. See K.S.A. 2014 Supp. 60-460. The declarant, therefore, avoids the principal mechanisms for measuring the candor and reliability of a witness: (1) the taking of an oath to tell the truth; (2) the rigor of cross-examination to test the statements; and (3) the factfinder's opportunity to gauge demeanor. See *State v. Becker*, 290 Kan. 842, 846, 235 P.3d 424 (2010); *United States v. Owens*, 789 F.2d 750, 756 (9th Cir. 1986), *rev'd on other grounds* 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); *Garza v. Delta Tau Delta Fraternity Nat.*, 948 So. 2d 84, 90 (La. 2006). Hearsay exceptions allowing out-of-court statements to be admitted for their truth commonly substitute other indicators of reliability based on circumstances related to the statement itself. See, *e.g.*, *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir. 1981) ("The basis for the business record exception is that accuracy is assured because the maker of the record relies on the record in the ordinary course of business activities.").

Paulson sought to exclude testimony from Putman as to what Valerie said immediately after he dropped her off at Putman's house the day before the attacks. Paulson, Valerie, and their sons had driven back from Augusta to Saline County. Putman testified that Valerie was crying and otherwise visibly upset as she came inside. Putman asked what was wrong. According to Putman, Valerie said Paulson cussed her, accused her of having an affair, suggested she should kill herself, and told her he had prayed God would kill her because she did not deserve to live. Paulson contends Putman's testimony amounted to inadmissible hearsay.

26

The testimony actually consists of two potential levels of hearsay. There is what Paulson ostensibly said to Valerie and, in turn, what Valerie told Putman. Each level must satisfy an exception to the general rule excluding hearsay statements offered to prove the truth of the matters represented in the statements. Nobody disputes the exception for Paulson's purported statements to Valerie. When offered by the State, they plainly are admissions of an opposing party and, therefore, excepted from the hearsay rule under K.S.A. 2014 Supp. 60-460(g). Moreover, Paulson's purported statements arguably were not offered for the truth of the statements, *e.g.*, that God should, in fact, kill Valerie, but as evidence of his state of mind shortly before the homicide. We needn't explore that aspect of the hearsay problem further.

The district court found Valerie's statement to Putman satisfied the hearsay exceptions in K.S.A. 2014 Supp. 60-460(d) for excited utterances and for declarations of an unavailable witness made in circumstances suggestive of honesty and veracity. The statement needed to fit within one or the other of those exceptions.

As set forth in K.S.A. 2014 Supp. 60-460(d)(1) and (2), an out-of-court statement that "narrates, describes or explains" an "event or condition" may be admitted if the declarant made the statement while "under the stress of a nervous excitement caused by such perception" of the event or condition. See *State v. Boldridge*, 274 Kan. 795, 804-05, 57 P.3d 8 (2002). In other words, the hearsay exception applies to an out-of-court statement of a person describing an especially stressful situation so long as the person remains under that stress even if the situation itself has concluded. The notion behind the exception is that a person demonstrably in the grip of "nervous excitement" or stress hasn't the wherewithal to deliberately fabricate about the circumstances causing that excitement or stress. So a person in that frame of mind making a statement about those circumstances may be considered truthful and to that extent reliable. See *State v. Brown*, 285 Kan. 261, 295, 173 P.3d 612 (2007); *Boldridge*, 274 Kan. at 805-06; *Haggins v.*

27

*Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057-58 (6th Cir. 1983) (extended discussion of rationale for excited-utterance hearsay exception).

According to Putman, Valerie was obviously upset and distressed when she was dropped off. What had unraveled her were Paulson's recent statements that could fairly be considered vicious—statements the district court necessarily found sufficiently disquieting to induce a nervous excitement in Valerie. Valerie's declaration to Putman, in turn, described those statements.

Paulson counters that Valerie's declaration to Putman couldn't have been reliable. For example, he points out the couple's sons didn't hear such statements during the car trip. But they were asleep at least some of the time. Paulson notes that Valerie told her brother 2 weeks earlier about a "praying-for-God-to-kill-you" statement Paulson had supposedly made. But that could mean Paulson said something to that effect more than once.

As to the statement Valerie made to Putman, the district court applied the appropriate legal criteria and understood the pertinent facts. We are not prepared to say no other district court judge would have ruled the same way. The district court did not abuse its discretion in finding the excited-utterance hearsay exception in K.S.A. 2014 Supp. 60-460(d)(2) applicable.

We briefly consider the hearsay exception in K.S.A. 2014 Supp. 60-460(d)(3) for statements by an unavailable witness. Valerie, of course, was unavailable. K.S.A. 60-459(g)(3) (witness unavailable if at time of trial he or she is dead). The exception requires the out-of-court statement to have been made: (1) shortly after the declarant perceived the matter; (2) while the declarant's recollection was clear; (3) in good faith before the litigation had begun; and (4) with no incentive on the part of the declarant to falsify or distort. K.S.A. 2014 Supp. 60-460(d)(3). Here, again, Paulson suggests the evidence the

28

district court considered in ruling on the hearsay exception indicated Valerie wasn't necessarily acting in good faith and might have had an incentive to recount her interactions with him falsely. In some general sense, the deteriorating marriage could be considered as a possible reason for either Valerie or Paulson to be less than candid in discussing their relationship at that time. But Paulson relies on what we have already discussed as specific information casting doubt on the truthfulness of Valerie's statement. That information was insufficient to bar admission of Valerie's statement under K.S.A. 2014 Supp. 60-460(d)(3). We find no abuse of discretion in the district court's alternative ruling applying that hearsay exception.

In resolving this sort of preliminary or gatekeeper issue pertaining to the admissibility of testimony or documents, the district court looks at the evidence the parties have presented on that issue itself—often in a hearing before trial or outside the presence of the jury. The evidence need not exclusively favor the party offering the testimony or documents, and the district court may weigh conflicting evidence in determining if the criteria for admission or, as in this case, for a hearsay exception have been met. See K.S.A. 60-408; *State v. Pittman*, 199 Kan. 591, 596, 433 P.2d 550 (1967) (In making a preliminary determination as to the admissibility of a criminal defendant's confession to police, the district court was permitted to resolve conflicting evidence about threats the officers purportedly made to induce the inculpatory statement.); see also *Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (under F.R.E. 104, comparable to K.S.A. 60-408, proponent of evidence must establish preliminary requirements for admissibility by preponderance standard). Notwithstanding any preliminary ruling of a district court admitting evidence, the opponent may dispute the weight and credibility of that evidence in front of the jury. K.S.A. 60-408. Paulson took full advantage of that prerogative.

We turn to the district court's decision to admit Valerie's out-of-court statements to friends and family about the state of her marriage to Paulson and about how he treated

29

her. For context, we highly summarize the sort of testimony the jurors heard. Putman testified that Valerie said: (1) she was scared Paulson would find out about her spending; (2) Paulson told her that he did not love her and had moved out of the bedroom; (3) there was tension in the house; and (4) she did not want to be in the house when Paulson was there. Kyrsten testified Valerie told her Paulson was controlling, treated her like one of his employees, and never acted as if she were an equal. One of Valerie's friends testified that Valerie related various arguments she had with Paulson about money, described the marriage as difficult, and confided she wanted to end the relationship. Three other witnesses testified to similar statements Valerie had made at various times.

Over Paulson's objection, the district court allowed the testimony, reasoning that it both was relevant to Valerie's state of mind and fit within the "marital discord" doctrine. The first reason provides an unsatisfactory basis for the ruling. Although the testimony would have been relevant to establishing Valerie's state of mind, her state of mind had no relevance to any disputed, material issue in the case. The State had to prove Paulson attacked Valerie and Putman with an intent to kill to convict him of second-degree murder and attempted second-degree murder and, additionally, with premeditation to convict him of first-degree murder and attempted first-degree murder. Valerie's state of mind or perception of her marital relationship and of Paulson's general attitude toward her had no bearing on those substantive legal issues. So that rationale didn't support the district court's ruling.

The marital discord doctrine is a fuzzy common-law concept allowing evidence that a marriage has been marked by more than ordinary contentiousness—something in the realm of unilateral or mutual bellicosity—if that would be relevant to a disputed, material issue in a given case. The State often invokes the doctrine in prosecuting one spouse for the violent death of the other spouse to help prove identity and premeditation by showing extreme marital discord as a motive for the crime. See *State v. Thompkins*, 271 Kan. 324, 335-36, 21 P.3d 997 (2001); *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d

30

1140 (1983) ("The rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship . . . is competent as bearing on the defendant's motive and intent."). The doctrine persists. See *State v. Harner*, No. 110,605, 2015 WL 4879012, at *14-15 (Kan. App. 2015) (unpublished opinion).

The swath of evidence allowed under the doctrine is remarkably wide. Evidence of past physical injuries to the deceased spouse has been admitted. Witnesses may testify to arguments between the spouses and what they may have yelled at each other—not to prove the truth of the matters asserted but the nature of the discord. Out-of-court statements of the deceased spouse to third parties about disharmony in the marriage have been permitted. *State v. Drach*, 268 Kan. 636, 649, 1 P.3d 864 (2000) (discussing types of evidence admissible under doctrine).

At least since *State v. Gunby*, 282 Kan. 39, 55-57, 144 P.3d 647 (2006), evidence of marital discord involving other crimes or civil wrongs of the defendant must conform to the requirements of K.S.A. 2014 Supp. 60-455. Here, the evidence did not implicate K.S.A. 2014 Supp. 60-455, and Paulson does not argue otherwise.

Marital discord evidence may be allowed even if it would otherwise be inadmissible as hearsay. *Drach*, 268 Kan. at 649; *State v. Cheeks*, 258 Kan. 581, 588, 908 P.2d 175 (1995). The testimony Paulson challenges appears to fall in that category. Unless Valerie's statements were offered for the truth of the matters asserted, *i.e.*, how Paulson treated her and what he had said to her, they haven't any relevance, since her opinion or assessment of the marriage did not itself tend to show discord. Just why a common-law hearsay exception should flourish when the rules of evidence have been codified presents an unanswered riddle. But it is not for us to answer that riddle.

The quantity and repetitiveness of the evidence, largely Valerie's characterizations of the marriage and Paulson's behavior toward her, seems noteworthy. But the district

31

court's decision to allow the evidence conforms to the doctrine as outlined in *Drach*, 268 Kan. at 649, and elsewhere. We, therefore, find no error.

Even if we were mistaken, Paulson cannot demonstrate prejudice to a degree depriving him of a fair trial in the sense there might reasonably have been a different outcome if the evidence had been excluded. *State v. Greene*, 299 Kan. 1087, 1095, 329 P.3d 450 (2014). First, there was other admissible evidence of the deteriorating marriage, including Paulson's move from the marital residence and his (clearly admissible) statements to third parties. Paulson's defense was built around the notion that he suspected Valerie was having an affair after her earlier adulterous relationship had financially and emotionally upended the marriage—a significant indicator of marital disharmony.  And, as we have noted, the jury acquitted Paulson of premeditated, first-degree murder—the charge to which the proof of motive and the marital-discord evidence most directly related. The acquittal on the most serious charges also suggests the jury did not convict out of an impermissible aversion to Paulson because he treated Valerie poorly during their marriage.

Paulson has failed to establish a ground for relief based on the admission of Valerie's out-of-court statements.

*Paulson's Jailhouse Statements*

The State offered as evidence and the district court admitted recordings of conversations Paulson had with Kyrsten, his parents, and others while he was in jail after his arrest and before trial. The district court also admitted several letters Paulson wrote during that time. Paulson made many of the statements shortly after he killed Valerie and injured Putman, but some of them were months later. The district court ruled the statements relevant to Paulson's intent and state of mind. Paulson counters that the jurors may have been confused by the statements insofar as they either reflected what he was

32

thinking at the time he made them rather than during the attack or contained ambiguous remarks that might or might not be inculpatory.

We again review the district court's decision under the standards governing the rulings on the admission of proffered evidence. For purposes of that review, we need not catalogue the statements. We offer a couple of examples. While in jail, Paulson asked several family members if any "creeps" attended Valerie's funeral or if any men in attendance were unexpectedly attentive. At trial, Kyrsten testified Paulson left almost $15,000 in cash at her house the day of Valerie's death and offered the cryptic comment that he would discuss his plans for the money later. When Kyrsten spoke with Paulson in jail, he indicated she pay for Valerie's funeral with the money. During one conversation, Kyrsten asked Paulson if he planned "it," meaning the attack, and he responded simply that they were being recorded.

Paulson essentially argues for a rule that would admit statements of defendants made after the alleged criminal conduct only if the statements are patently inculpatory or otherwise clearly indicative of a guilty mind. The rules of evidence are not so restrictive. Evidence need only have some tendency to make a material, disputed proposition more or less likely true to be admissible. K.S.A. 60-401(b); *State v. Smith*, 299 Kan. 962, 969, 327 P.3d 441 (2014).

Paulson cites *State v. Cathey*, 241 Kan. 715, 730, 741 P.2d 738 (1987), *disapproved on other grounds State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), as supporting his argument. But it doesn't. In that case, the Kansas Supreme Court found a jury instruction on flight as circumstantial evidence of guilt to be prejudicial because it impermissibly highlighted a particular piece of the State's case over other trial evidence. 241 Kan. at 730-31. Paulson isn't claiming an instructional error. He contends the evidence wasn't sufficiently relevant. The *Cathey* court observed that evidence of consciousness of guilt is admissible and pointed to flight, concealment, and providing

33

false information as examples. 241 Kan. at 730. A defendant's efforts to cover up a crime or to evade capture are at least suggestive of guilt on the theory an innocent person wouldn't engage in that sort of conduct. But that proposition doesn't mean other conduct or statements of a defendant after the crime should be treated as inadmissible, although Paulson's argument appears to suggest as much. The State may admit a defendant's statements having some direct or circumstantial bearing on intent and motive regardless of when they are made. Although Paulson's statements were not confessions and their inculpatory character may have been dependent upon interpretation or their context with other evidence, those characteristics go to the weight jurors might give them and not their admissibility. See *United States v. Bruguier*, 161 F.3d 1145, 1152 (8th Cir. 1998); *People v. Boss*, No. 267013, 2007 WL 2189055, at *2 (Mich. App. 2007) (unpublished opinion); *State v. Perez*, 177 N.J. 540, 553, 832 A.2d 303 (2003).

Paulson also relies on *State v. Harkness*, 252 Kan. 510, 528-30, 847 P.2d 1191 (1993), but that reliance is similarly misplaced. In that case, Harkness was charged with a series of sex offenses and argued he was not guilty because he was legally insane as the result of his unmedicated schizophrenia. Early in the case, Harkness was found incompetent for trial and was committed to Larned State Hospital; he remained there until medication and other treatment brought his illness under control. A jury rejected his insanity defense. On appeal, Harkness argued the district court erred in refusing to admit a series of letters he had written while at the state hospital several months after the crimes. Harkness contended the letters should have been allowed not for their content but to show his mental condition—that is, as demonstrative of the rationality and orderliness of his thought processes and the improvement in those processes over the course of his hospitalization. The district court rejected them because the case turned on Harkness' mental condition at the time of the offenses. The Kansas Supreme Court affirmed and pointed out that had the letters been admitted for that purpose, the jurors would have been required to make a psychological evaluation of them, something they lacked the expertise to do. 252 Kan. at 530. So the letters simply would have invited unguided speculation.

34

Here, the State introduced Paulson's jailhouse statements and letters precisely for their content. On the State's theory of the case, the factual information Paulson conveyed in the communications bore on his motive and intent—his state of mind—when he attacked Valerie and Putman. That's a purpose entirely different from the use Harkness intended to make of his letters. The State wasn't offering Paulson's communications to show he was thinking rationally during his pretrial detention and, therefore, must have been thinking rationally at the time of the attack.

We find no basis for reversing the convictions because of the admission at trial of Paulson's written and oral communications from jail.

*Suppression of Paulson's Statement to Law Enforcement*

Paulson has appealed the denial of his motion to suppress a statement he made to Deputy Timothy S. Allen of the Ottawa County Sheriff's Department the morning after he attacked Valerie and Putman. He argues he did not waive his *Miranda* rights and the statement was also involuntary under the circumstances. The Fifth and Fourteenth Amendments to the United States Constitution preclude a state from using as evidence a criminal defendant's involuntary statements or custodial statements given without *Miranda* warnings. *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009) (involuntary statements); *Harris v. New York*, 401 U.S. 222, 223-25, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971) (*Miranda* violation bars State's use of defendant's statement in case-in-chief); *State v. Schultz*, 289 Kan. 334, 342-43, 212 P.3d 150 (2009) (involuntary statements).

The district court held an evidentiary hearing on the motion to suppress several months before trial. As we earlier indicated, Paulson drove away from the house after attacking Valerie and Putman. Later that evening or the next morning, Paulson drove his pickup off the road near Bennington and managed to slip or jump into a pond or creek, so

35

his clothes were wet. Shortly after 6 a.m. the next morning, Paulson approached a house in a rural area near the road. He asked a teenager there to contact the police. At the suppression hearing, the young man described Paulson as "dazed and confused." The young man had used all the minutes on his cell phone and thought he could not call the police. Because Paulson seemed in need of help, the young man drove him to a café in Bennington, the nearest community. At the hearing, the young man testified he did not recall Paulson saying much of anything during the short ride.

After the two arrived at the café, someone contacted the police. The hearing record isn't clear about who did. As Deputy Allen drove up in a patrol car, the young man left. Allen testified that he saw Paulson sitting in a booth drinking a cup of coffee. Allen approached Paulson, told him to keep his hands on the table, and apparently indicated he could finish his coffee. At that point, Allen knew only that Paulson was a suspect in a stabbing death in Saline County. Allen awaited the arrival of Ottawa County Sheriff Keith Coleman before doing anything else.

When Coleman entered the café, he and Allen asked Paulson to step outside. Both officers described Paulson as polite and cooperative. They noticed his clothing was wet.

In the parking lot, Coleman read Paulson the *Miranda* warnings from a printed card he carries while on duty. Paulson does not claim Coleman misread or omitted some portion of the required warnings. After reading the warnings, Coleman asked Paulson if he understood his rights. According to Coleman, Paulson nodded his head affirmatively once or twice. Allen testified Paulson nodded his head. They agree Paulson never responded orally to that question. And Coleman never asked Paulson if he wished to give up those rights or if he wished to speak with the officers. Coleman handcuffed Paulson and seated him in Allen's patrol car. Coleman had no other communication with Paulson.

36

On the way to the Ottawa County jail—about an 11-minute ride—Allen asked Paulson, "[H]ow [did] all of this [get] started?" According to Allen, Paulson responded, "She was cheating on him and was going to take the kids." Allen testified he did not ask Paulson more questions or otherwise attempt to elicit any details about what happened in Saline County. Allen said his job was simply to transport Paulson to the jail and hold him for Saline County authorities. The suppression hearing transcript isn't entirely clear on the chronology of the communication between Allen and Paulson. At some point, they also had a conversation about a photograph of three children Paulson had in his wallet. Allen testified Paulson was insistent that his children get the photograph. Allen tried to find out where Paulson's truck might be. Paulson couldn't give him a precise location and simply said it was in a cornfield as he pointed to the northeast.

At the hearing, Allen testified Paulson did not appear to be drunk or under the influence of drugs. Paulson responded coherently and appropriately to what was said to him. He did not indicate he was injured or in pain. And he did not cry, scream, or exhibit any other extreme emotional behavior or distress. At the jail, Paulson said he was cold. He was permitted to change out of his clothes and into a jail uniform.

Paulson did not testify at the suppression hearing. The district court took the motion under advisement and on March 14, 2012, made a detailed bench ruling as part of a longer pretrial hearing. The district court found: (1) Paulson understood the *Miranda* warnings and acknowledged them by nodding his head; (2) neither Coleman nor Allen coerced Paulson or otherwise misled or took advantage of him; and (3) Paulson was in command of his faculties at the café and during the ride to the jail. The district court concluded Paulson's statements were freely and voluntarily given, the law enforcement officers informed Paulson of his *Miranda* rights, and Paulson effected a waiver of those rights by acknowledging them and then speaking with Allen.

37

In reviewing a district judge's ruling on a motion to suppress, an appellate court applies a bifurcated standard. The appellate court accepts the factual findings of the district judge if they are supported by competent evidence having some substance. The appellate court exercises unrestricted review of the legal conclusions based upon those findings, including the ultimate ruling on the motion. *State v. Garcia*, 297 Kan. 182, 186, 301 P.3d 658 (2013); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The prosecution bears the burden of proving the admissibility of the statements by a preponderance of the evidence. *Garcia*, 297 Kan. at 188; *State v. Shumway*, 30 Kan. App. 2d 836, 842, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002).

The ultimate issue here is whether Paulson's *Miranda* waiver and his statements were the product of his free and independent will, *i.e.*, did he act voluntarily? See *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 3, 4, 276 P.3d 165 (2012); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010); *State v. Mattox*, 280 Kan. 473, Syl. ¶ 3, 124 P.3d 6 (2005). The district court must examine the totality of the circumstances surrounding the waiver and the statements. *Garcia*, 297 Kan. at 188. Among the factors to be considered in assessing voluntariness are:  "(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *Gilliland*, 294 Kan. 519, Syl. ¶ 3; see *Stone*, 291 Kan. at 21. The district court reviewed and applied those factors.

As to voluntariness, we need not rehash all that has been laid out in the record and again here. Although some testimony suggested Paulson was less than fully engaged—dazed and confused—as he sought to contact the police the morning of July 7, 2010, the district court's findings that he understood what was going on after he arrived at the café and Allen showed up have ample factual support in the record. The testimony from Allen and Coleman about their interaction with Paulson was undisputed. They perceived him to

38

be rational, coherent, and free of any impairment or duress. To the extent there might have been some difference between Paulson's mental acuity when he contacted the young man and how the officers described him later, we may fairly conclude that Paulson focused and gathered himself as he sat in the café drinking coffee in anticipation of the police arriving.

Coleman and Allen treated Paulson fairly. Apart from the single, rather generic question Allen put to Paulson during the brief ride to the jail, neither officer attempted to interview or interrogate him. This was not one of those situations in which law enforcement officers try to mentally or physically coerce suspects, trick them, or deliberately deplete their resistance to extract confessions. See *Stone*, 291 Kan. at 32-33. Nothing about Paulson's age, intellectual capacity, or background rendered him especially susceptible to being manipulated or easily confused. We find the district court's factual findings on voluntariness appropriate and discern no legal error in the conclusion that Paulson freely and voluntarily spoke to Coleman and Allen.

That leaves Paulson's more narrow point regarding the legal sufficiency of his acknowledgement and waiver of his *Miranda* rights based on a nod of his head rather than something more formal or at least more verbal. Both Paulson and the State cite *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979), as authority. Paulson also notes the Kansas Supreme Court has elaborated on *Butler* in *State v. Kirtdoll*, 281 Kan. 1138, 1146, 136 P.3d 417 (2006). Those cases do not assist Paulson. In *Butler*, 441 U.S. at 373, the Court rejected a rule that would require "[a]n express written or oral statement of waiver" of the right to remain silent or the right to consult with a lawyer. The Court recognized that a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver" could be sufficient to waive those protections. 441 U.S. at 373. The *Kirtdoll* decision applied the principles of *Butler* to find a waiver in that case. 281 Kan. at 1146-47.

39

Here, Paulson was fully informed of his *Miranda* rights. That's undisputed. He acknowledged his understanding of those rights. That's the nod of his head. A nod is a gesture commonly understood to convey an affirmative expression or understanding in contrast to a shake of the head. Under the facts, there is no reason to presume something different from Paulson's action.

When Paulson answered Allen's question during the ride to the jail, he engaged in conduct evincing a waiver. He just as easily could have refused to answer or asked for a lawyer. The circumstances were not particularly overbearing, and Allen had done nothing to physically or psychologically intimidate Paulson. To the contrary, Allen allowed Paulson to sit at the café and finish his coffee before taking him into custody. So nothing undermines the obvious inference to be drawn from the situation—Paulson chose to answer Allen's question rather than assert his constitutional right to refuse.

The requirement for *Miranda* warnings aims to lessen the often highly disconcerting and overwhelming atmosphere cultivated in a police interrogation room in which multiple officers may question a suspect in almost unrelenting shifts or may deploy psychological gambits designed to break resistance and loosen tongues. See *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1086-87, 337 P.3d 691 (2014). In those circumstances, silence followed by an inculpatory statement likely would not be enough to establish a waiver. But Paulson was not subjected to those sorts of conditions. His conduct can be reasonably viewed as indicative of a waiver.

*Cumulative Error*

Finally, as to the convictions, Paulson contends the cumulative impact of the ostensible trial errors deprived him of a fair trial. Appellate courts will weigh the collective effect of trial errors and may grant relief if the overall result of the miscues deprives the defendant of a fair hearing even when each, considered alone, could be

40

dismissed as harmless. *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). We do not belabor this point. Any potential errors were confined to the State's closing argument. Having carefully reviewed the prosecutor's improper arguments to the jurors and the district court's responses to the defense objections, we find insufficient cumulative prejudice to Paulson to say he was deprived of a fair trial.

*District Court's Imposition of BIDS Fees and Restitution*

Paulson contends he should not be assessed attorney fees for the appointed lawyer who represented him through the preliminary hearing. The district court ordered Paulson to pay about $8,200 to the Board of Indigents' Defense Services for the lawyer's work. Some background is necessary to outline this unusual dispute and to show why the district court correctly imposed the reimbursement.

Putman filed a civil tort action against Paulson to recover damages for her injuries. In that case, another district court judge entered an order of prejudgment attachment of Paulson's assets, effectively freezing those assets and preventing Paulson from using them to hire a lawyer to represent him in this case. Paulson, therefore, was considered indigent and entitled to representation by an appointed lawyer paid through BIDS. The district court approved Paulson's application for appointed counsel.

At some point the district court judge assigned to the civil case withdrew the prejudgment attachment. As a result, Paulson could afford to hire a lawyer in this case and did so. Putman's civil action against Paulson was eventually settled. After the convictions in this case, the district court ordered that Paulson reimburse BIDS for the amount the agency paid the appointed lawyer. See K.S.A. 22-4513.

In challenging the reimbursement order on appeal, Paulson contends the prejudgment attachment of his assets entered in the civil case was illegal. But he has not

41

presented an order or ruling from the district court judge in the civil case to that effect. So Paulson is making a collateral attack in this case on the prejudgment attachment entered in the civil case. We are not disposed to rule on the efficacy of a district court judge's pretrial order in another case involving at least one different party long after that case has been settled, apparently without a ruling on the issue by either the district court judge or an appellate court.

Alternatively, Paulson says the district court failed to conduct an adequate hearing to determine whether he reasonably could be expected to pay the BIDS reimbursement. As provided in K.S.A. 22-4513(b), the district court "shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." See *State v. Robinson*, 281 Kan. 538, 546, 132 P.3d 934 (2006) ("[T]he sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision.")

By the time Paulson was sentenced, he had depleted his assets. The district court found that Paulson had been gainfully employed and suffered from no debilitating mental illness or substance abuse, so he could expect to be employed in the future. The district court noted that Paulson apparently would have no significant financial obligations upon his release from prison. Accordingly, the district court found the BIDS fees properly should be assessed to him. On appeal, Paulson counters that those considerations are insufficient, since he will not get out of prison for about 18 years and his employment prospects as a convicted felon in his mid-50s will be limited.

The district court adequately considered the circumstances facing Paulson and reached a conclusion fairly within those circumstances. Under K.S.A. 22-4513(b), a district court may later modify a BIDS reimbursement order if the financial obligation creates "manifest hardship on the defendant." Paulson's position really is more of a

42

premature pitch for a hardship modification. Paulson has presented no legally sufficient reasons for reversing the district court's order he reimburse BIDS for the services of his appointed lawyer.

Finally, Paulson contends the district court erred in ordering that he pay just over $18,000 in restitution to the Kansas Crime Victims Fund for compensation it granted Putman for economic losses she incurred as a result of the attack. Again, some background is in order, although many of the details remain sketchy in the appellate record.

The State operates the Fund to provide compensation to qualifying crime victims. A victim must submit an application to the Fund's governing board and may receive up to $25,000 for economic harm resulting from a crime. See K.S.A. 74-7301 *et seq.* Putman received compensation from the Fund while her civil action for damages was pending against Paulson. As we indicated, she ultimately received a payment from Paulson in settlement of that action, although the amount is not apparent from the record.

Upon Paulson's conviction in this case, Putman was entitled to an order requiring Paulson to pay restitution to her as part of his sentence. See K.S.A. 2010 Supp. 21-4603d(b)(1). In fashioning restitution, the district court should aim for an adequate make-whole remedy serving to compensate the victim fairly, on the one hand, and to help rehabilitate and deter the defendant, on the other. See K.S.A. 2010 Supp. 21-4603d(b)(1) (restitution "shall include . . . damage or loss caused by the defendant's crime"); *State v. Hinckley*, 13 Kan. App. 2d 417, 419, 777 P.2d 857 (1989). The Kansas appellate courts have recognized that a third party compensating a crime victim for losses may be entitled restitution to the extent of that compensation. See *State v. Beechum*, 251 Kan. 194, 203, 833 P.2d 988 (1992); *State v. Schmitter*, No. 101,524, 2010 WL 445915, at * 1 (Kan. App.) (unpublished opinion), *rev. denied* 290 Kan. 1102 (2010). The third party

43

effectively occupies the victim's statutory position as the recipient of any restitution payments. By virtue of the payments to Putman, the Fund stepped into that position.

So a crime victim may receive restitution in a criminal case and may be granted compensation from the Fund. Those are separate statutory mechanisms to financially assist crime victims. Those mechanisms sometimes overlap, as they did here.

Apart from those statutory devices, a crime victim may sue a perpetrator civilly for damages—Paulson's attack on Putman would have been a civil wrong for the intentional tort of battery among other possible causes of action. A civil tort action would be a common-law mechanism for recovery. Those suits are comparatively rare because wrongdoers also charged criminally seldom have sufficient assets to make civil litigation against them worthwhile and most intentional acts aren't covered under standard insurance policies.

Under K.S.A. 74-7312, the Fund has a right to recoup compensation it has paid to a crime victim if the victim recovers money through another source, including the perpetrator of the crime. The statute specifically provides "the [S]tate shall be subrogated" to the victim's right to recover economic losses from other sources. K.S.A. 74-7312. The Fund's right extends to damages the victim receives in a civil action against the perpetrator and to restitution a defendant is ordered to pay in a criminal case.

With that background, we turn to the specific argument Paulson says extinguishes his obligation to pay restitution to the Fund. According to Paulson, the settlement agreement Putman signed in her civil action against him included a broad release of liability covering virtually any person or any entity that might claim through her. Sweeping releases are commonplace in negotiated settlements of civil suits. Paulson says the settlement, then, extends to the Fund. (The settlement agreement is not in the record

44

on appeal. The journal entry of dismissal of Putman's civil action is, but it does not contain the terms of the settlement or any release.)

Paulson relies on what he characterizes as "general principles of insurance law" to the effect that a wrongdoer obtaining a general release from an injured party in good faith and without knowledge of any benefits that party has received under an insurance policy has no additional liability to the insurer. That is, the release cuts off the insurer's right to either direct reimbursement from the wrongdoer or subrogation. Paulson cites 16 Couch on Insurance § 224:117 (3d ed. 2005), and *American Automobile Ins. Co. v. Clark*, 122 Kan. 445, 449-50, 252 P. 215 (1927), for the principle. In turn, based on that principle, Paulson submits that the settlement and release in the civil action extinguished the Fund's right to recover from him for any payment it made to Putman. We disagree.

The *Clark* decision contains the legal proposition Paulson ascribes to it but cites no supporting authority for the idea. We suppose without deciding that *Clark* actually reflects modern insurance law in Kansas. We have found no other Kansas appellate decision citing *Clark* for that proposition. Paulson has pointed to none and has given us no other Kansas authority for the rule. But the rule appears to be inapplicable if the wrongdoer is aware of an insurer's subrogation rights when settling a civil action with the injured party. See *City of New York Ins. Co. v. Tice*, 159 Kan. 176, 182, 152 P.2d 836 (1944), *overruled on other grounds Ellis Canning Co. v. International Harvester Co.*, 174 Kan. 357, Syl. ¶ 3, 255 P.2d 658 (1953). Because of our resolution of the issue, we need not undertake an exegesis of Kansas insurance law or even define the current law on the point Paulson asserts. Our discussion in that respect is more dabbling than definitive and should be taken that way.

The success of Paulson's argument depends upon treating the Fund as a private insurance carrier to which the "general principles" of insurance law apply. Paulson, however, never explains why that should be true. The Fund is not an insurance

underwriter issuing policies to individuals covering them against designated perils in exchange for the payment of a premium presumably calculated on some actuarial basis. Nor does the Fund even operate like an insurer. Rather, the Fund functions more as a state-sponsored charitable organization: It considers applications for compensation from crime victims only after a financial loss but has no connection to or relationship with those individuals beforehand. We fail to see a good reason insurance law should regulate the interplay among the Fund, crime victims, and criminal defendants.

Moreover, the insurance principles on which Paulson relies—whatever they may say—are really a species of the common law of contracts. Those common-law doctrines cannot supersede or negate statutory rules. See *Stanley v. Sullivan*, 300 Kan. 1015, Syl. ¶ 1, 336 P.3d 870 (2014); *Jackson v. Lee*, 193 Kan. 40, 43-44, 392 P.2d 92 (1964). The statutory right of the Fund to recover compensation paid a crime victim does not include the specific common-law principle of insurance law Paulson cites. Nor does the statutory scheme regulating the Fund expressly incorporate general insurance law.

Paulson cites *Herron v. Gabby's Goodies*, 29 Kan. App. 2d 42, 44-45, 24 P.3d 747 (2001), as "at least implicitly support[ing]" his position on the Fund's right to restitution. But after outlining the facts in *Herron*, Paulson fails to explain the implication, and we don't see it. In that case, the Fund paid compensation to Herron, who later obtained a civil recovery from the criminal wrongdoer. But Herron had not given notice of the civil action to the Fund, as required by K.S.A. 74-7312. When the Fund asserted its statutory subrogation right to part of the civil recovery for the compensation it had paid, Herron argued that the amount should be reduced by a reasonable attorney fee, since he had retained a private lawyer who successfully sued the wrongdoer. The court held that Herron's right to a reduction for attorney fees was governed by K.S.A. 74-7312(b) and the statute required proper notice of any civil action be given the Fund. Because Herron failed to strictly comply with the notice requirements, he could not claim a reduction for attorney fees either statutorily or in equity. 29 Kan. App. 2d at 43-45.

46

The *Herron* decision seems to be inapposite here except on the most general level, since it deals with the legal relationship between the Fund and a crime victim receiving compensation. In turn, the decision extends to the Fund a right to recover the full amount of any compensation paid a crime victim if the crime victim fails to give notice of a civil suit against the wrongdoer. We fail to see how that rule would extinguish the Fund's legal right to restitution from the wrongdoer for its payment to the crime victim. Again, at a general level, *Herron* could be read to say the Fund's statutory right to recover compensation paid a crime victim will be fully enforced to the exclusion of the common law, including equity doctrines. That would undercut Paulson's argument for applying insurance law principles. While we don't necessarily endorse reading *Herron* so expansively, we find nothing in the decision aiding Paulson.

Accordingly, Paulson had not advanced a sound reason for extinguishing the Fund's legal right to restitution in this case.

Although Putman may have received a double recovery for at least part of her economic loss—assuming the civil settlement included compensation for financial harm—Paulson has not argued for a setoff or some other adjustment of the restitution amount. We do not consider whether such an accommodation might be appropriate.

CONCLUSION

We have studied the points Paulson has raised in his thorough briefing on appeal and the State's detailed response. We have carefully surveyed the exhaustive appellate record. Our labors have disclosed no grounds to find Paulson received less than a fair trial or to suggest the jury's verdicts should be considered infirm. Paulson has offered no arguments undercutting the district court's orders on either BIDS reimbursement or restitution.

47

Affirmed.